Eric F. Leon (EL-5780)
Laura B. Kadetsky (LK-8039)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



---

ABACUS AMERICA, INC. d/b/a
APLUS.NET,

                  *Plaintiff,*

    - against -

TSV GROUP, INC.,

                  *Defendant.*

---

**COMPLAINT AND**
**JURY DEMAND**

**Case No.:**

ECF Case



Plaintiff Abacus America, Inc. d/b/a Aplus.Net ("Aplus.Net") for its complaint against TSV Group, Inc. ("TSV Group") alleges on personal knowledge with respect to its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE CASE

1.    Aplus.Net is forced to bring this action because TSV Group has refused to make payments that are owed to Aplus.Net pursuant to agreements entered into by the parties as part of an asset purchase and sale in August 2007.

2.    Effective August 1, 2007, Aplus.Net purchased TSV Group's Web Image business unit.  Pursuant to the Asset Purchase Agreement ("APA"), Transition Assistance Agreement ("TAA"), and Transition Services Agreement Statement of Work for Services and Assistance ("SOW") (collectively, the "Agreements"), TSV Group agreed to continue to collect revenues from customers of the Web Image business during August, September, and October 2007 (the "Transition Period").  (Copies of the APA, TAA, and SOW are attached as Exhibits A,

B, and C, respectively.) TSV Group agreed to transfer all such revenues to Aplus.Net within three (3) business days of collection. TSV Group failed to comply with these requirements in any material way. TSV Group is thus in material breach of the Agreements and has been unjustly enriched.

3.     Upon information and belief, TSV Group collected revenues of $416,135.90 from the Web Image business' customers during the Transition Period. Yet, over one month after the close of the Transition Period, TSV Group has transferred only $64,232.65 of the revenues to Aplus.Net.

4.     Further, under the APA, TSV Group was required to provide to Aplus.Net a Statement of Closing Net Working Capital Balance of the Web Image business within thirty (30) days of the closing of the asset purchase and sale (to enable the parties to determine final working capital adjustment cash payments due under the APA). Yet, over four months after closing, TSV Group has not provided a Statement of Closing Net Working Capital Balance to Aplus.Net. Aplus.Net estimates that the Statement of Closing Net Working Capital Balance will show a working capital adjustment payment due to Aplus.Net in the amount of $259,754.00.

5.     Accordingly, Aplus.Net is entitled to damages from TSV Group for breach of contract and unjust enrichment.

**THE PARTIES**

6.     Aplus.Net is an internet services business, providing website hosting, website design, domain name registration, and internet access.

7.     Aplus.Net is a California corporation with a principal place of business located in Overland Park, Kansas.

8.     TSV Group is an internet search and media company that provides online search marketing, local search, and online comparison shopping. TSV Group formerly provided

website design and hosting services through its Web Image business unit, which was sold to Aplus.Net.

9.       TSV Group is a Delaware corporation with a principal place of business located in White Plains, New York.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy is greater than $75,000.00.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because TSV Group resides within this District. In addition, venue is proper in this District pursuant to Paragraph 7(o) of the APA.

## BACKGROUND

12.      Effective August 1, 2007, Aplus.Net and TSV Group entered into the APA, pursuant to which Aplus.Net purchased from TSV Group all assets of TSV Group's Web Image business for the amount of $2,400,000.00.

13.      In connection with the APA, Aplus.Net and TSV Group also entered into the TAA and SOW. Paragraph 7(m) of the APA expressly incorporates the TAA. Article XI(O) of the TAA expressly incorporates the SOW.

14.      Under Paragraph 1 of the SOW and Article II(A) of the TAA, TSV Group agreed to provide services, consulting support, management, oversight, advice, and assistance to Aplus.Net to assist Aplus.Net in the transition of the existing business functions of the Web Image business.

15.      Under Paragraph 3(B) of the SOW, TSV Group further agreed that:

TSV shall continue to bill, collect and book revenue from customers in accordance with past practices (via credit card payments, wire transfer or other means of payment) from both existing customers as of the Closing and customers acquired after the Closing (the "Revenue Collection"). *Within three (3) business days of receipt of funds, TSV shall wire transfer such funds to the bank account as designated by [Aplus.Net] along with an accounting of any such funds.*

The Term of Revenue Collection shall be no more than (3) months.

16.    TSV Group failed to wire transfer all revenues collected during the Transition Period to Aplus.Net.

17.    Pursuant to Article III(A) of the TAA and Paragraph 4(A) of the SOW, Aplus.Net agreed to pay TSV Group a monthly fee of $25,000.00 for transition assistance (the "Monthly Fee").  At no time did Aplus.Net agree to pay any other fees or expenses to TSV Group.

18.    Under Article XI(H) of the TAA and Paragraph 7(h) of the APA, the parties expressly agreed that the Agreements and performance thereunder would be governed by and construed in accordance with New York law without regard to its choice of law principles.

19.    Upon information and belief, TSV Group collected revenues for the Web Image business during the Transition Period at TSV Group's facility located in White Plains, New York.

20.    Upon information and belief, in the Transition Period TSV Group collected revenues for the Web Image business in the amount of $416,135.90.

21.    In September 2007, TSV Group wire transferred to Aplus.Net $64,232.65 of the revenue that it collected from the Web Image business in August 2007.  In October 2007, TSV Group sent to Aplus.Net a check in the amount of $17,078.54, which Aplus.Net has not cashed.  TSV Group has made no other payments of collected revenue to Aplus.Net.

22.    TSV Group breached the TAA and the SOW by failing to pay to Aplus.Net all revenues collected from the Web Image business.

23.    TSV Group also breached the TAA and the SOW by failing to wire transfer collected revenues to Aplus.Net within three (3) business days of collection.

24.    Aplus.Net has informed TSV Group in writing that its withholding of the revenue breached the Agreements.

25.    Further, pursuant to Paragraph 2(h) of the APA, TSV Group agreed to provide a Statement of Closing Net Working Capital Balance ("Statement") to Aplus.Net within thirty (30) days of the closing of the transaction. Aplus.Net requested the Statement from TSV Group in writing but has never received it. TSV Group therefore breached the APA by failing to provide the Statement.

26.    Aplus.Net estimates that the Statement of Closing Net Working Capital Balance will show a working capital adjustment payment due to Aplus.Net in the amount of $259,754.00.

27.    Under Paragraph 5(b) of the APA, TSV Group agreed to pay Aplus.Net's attorneys' fees and expenses arising out of any breach by TSV Group of its covenants under the APA.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

28.    Aplus.Net incorporates the above paragraphs as if fully set forth herein.

29.    Aplus.Net and TSV Group are parties to valid and binding contracts — the APA, the TAA, and the SOW.

30.    Aplus.Net has at all relevant times performed or been prepared to perform each and every one of its obligations under the APA, the TAA, and the SOW.

31.    TSV Group breached the TAA and SOW by failing to wire transfer all revenues collected from the Web Image business to Aplus.Net within three (3) business days of receipt of such funds.

32.    TSV Group breached the APA by failing to provide a Statement of Closing Net Working Capital Balance within thirty (30) days of closing.

33.    As a result of TSV Group's breaches, Aplus.Net has been damaged in the amount of the revenues collected from the Web Image business during the Transition Period (*less* $75,000.00 in Monthly Fees and $64,232.65 in revenue received by Aplus.Net) *plus* an estimated $259,754.00 due to Aplus.Net as a working capital adjustment.

34.    Upon information and belief, that amount exceeds $530,000.00.


## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

35.    Aplus.Net incorporates the above paragraphs as if fully set forth herein.

36.    Between August 1, 2007, and October 31, 2007, TSV Group received Web Image business revenues that are properly due and owing to Aplus.Net.  In addition, TSV has retained a working capital adjustment payment that is properly due and owing to Aplus.Net.

37.    TSV Group has been unjustly enriched by its retention of funds that were not due or owing to it.  TSV Group has refused to transfer those funds to Aplus.Net, thereby enriching itself at Aplus.Net's expense.

38.    It would be inequitable and unjust to allow TSV Group to retain the benefits obtained at the expense of Aplus.Net as a result of TSV Group's improper conduct. Aplus.Net is entitled, therefore, to recover any benefits that TSV Group realized as a result of its improper conduct.

39.    In order to avoid the unjust enrichment of the Defendant, damages should be awarded to Aplus.Net in an amount not less than the amount of the revenues collected from the Web Image business during the Transition Period, *less* $139,232.65 (calculated as $75,000.00 plus $64,232.65), *plus* an estimated $259,754.00 due to Aplus.Net as a working capital adjustment payment.

## **PRAYER FOR RELIEF**

WHEREFORE, Aplus.Net prays for judgment as follows:

1. On Count One, breach of contract damages against TSV Group in an amount to be determined at trial.

2. On Count Two, damages against TSV Group for unjust enrichment in an amount to be determined at trial.

3. Costs and reasonable attorneys' fees as provided by contract.

4. Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

WHEREFORE, Aplus.Net hereby demands trial by jury of all issues properly triable thereby.

Dated: December 10, 2007
       New York, New York

Eric F. Leon (EL-5780)
Laura B. Kadetsky (LK-8039)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel for Plaintiff*
*Abacus America, Inc. d/b/a Aplus.Net*

**EXHIBIT A**

ASSET PURCHASE AGREEMENT


BETWEEN


ABACUS AMERICA, INC.
D/B/A APLUS.NET


AND


TSV GROUP, INC.


AUGUST _I_ , 2007

KC-1520120-1

TABLE OF CONTENTS

1.  Definitions ............................................................................................................ 1

2.  Basic Transaction ................................................................................................. 6
    (a)  Purchase and Sale of Assets .................................................................. 6
    (b)  Assumption of Liabilities ...................................................................... 6
    (c)  Purchase Price ........................................................................................ 6
    (d)  Closing .................................................................................................... 6
    (e)  Deliveries at Closing .............................................................................. 6
    (f)  Sales and Transfer Taxes ....................................................................... 7
    (g)  Allocation ................................................................................................ 7
    (h)  Working Capital Adjustment ................................................................ 7

3.  Seller's Representations and Warranties .......................................................... 8
    (a)  Organization of Seller ............................................................................ 8
    (b)  Authorization of Transaction ............................................................... 9
    (c)  No Conflicts; No Bankruptcy ................................................................ 9
    (d)  Brokers' Fees ........................................................................................... 9
    (e)  Title to Assets; Sufficiency of Assets ................................................... 9
    (f)  Financial Statements ........................................................................... 10
    (g)  Events Subsequent to Most Recent Fiscal Year End ......................... 10
    (h)  Undisclosed Liabilities ........................................................................ 11
    (i)  Legal Compliance ................................................................................. 12
    (j)  Tax Matters ........................................................................................... 12
    (k)  Properties .............................................................................................. 13
    (l)  Intellectual Property ............................................................................ 14
    (m)  Systems .................................................................................................. 16
    (n)  Data Security and Privacy .................................................................... 17
    (o)  Contracts ............................................................................................... 17
    (p)  Labor Matters ....................................................................................... 17
    (q)  Employee Benefit Plans ....................................................................... 17
    (r)  Environmental Matters ........................................................................ 18
    (s)  Powers of Attorney ............................................................................... 18
    (t)  Insurance ............................................................................................... 19
    (u)  Litigation ............................................................................................... 19
    (v)  Certain Business Relationships With Seller ....................................... 19
    (w)  Customers and Suppliers ..................................................................... 19
    (x)  Accounts Receivable ............................................................................. 19
    (y)  Disclosure .............................................................................................. 20

4.  Buyer's Representations and Warranties .......................................................... 20
    (a)  Organization of Buyer .......................................................................... 20
    (b)  Authorization of Transaction ............................................................. 20
    (c)  No Conflict ............................................................................................. 20
    (d)  Brokers ................................................................................................... 20

5.  Remedies for Breaches of This Agreement ...................................................... 20
    (a)  Survival of Representations and Warranties ...................................... 20
    (b)  Indemnification Provisions for Buyer's Benefit ................................ 21
    (c)  Indemnification Provisions for Seller's Benefit ................................ 21

|       | (d) | Matters Involving Third Parties | 22 |
|       | (e) | Maximum Indemnification Amount for Certain Claims | 23 |

| 6. | Post-Closing Covenants | | 23 |
|    | (a) | General | 23 |
|    | (b) | Notification of Customers | 23 |
|    | (c) | Litigation Support | 23 |
|    | (d) | Transition | 23 |
|    | (e) | Employee Matters | 24 |
|    | (f) | Confidentiality | 25 |
|    | (g) | Covenant Not to Compete | 25 |

| 7. | Miscellaneous. | | 26 |
|    | (a) | Press Releases and Public Announcements | 26 |
|    | (b) | No Third-Party Beneficiaries | 26 |
|    | (c) | Entire Agreement | 26 |
|    | (d) | Succession and Assignment | 26 |
|    | (e) | Counterparts | 26 |
|    | (f) | Headings | 26 |
|    | (g) | Notices | 26 |
|    | (h) | Governing Law | 27 |
|    | (i) | Amendments and Waivers | 27 |
|    | (j) | Severability | 28 |
|    | (k) | Expenses | 28 |
|    | (l) | Construction | 28 |
|    | (m) | Incorporation of Annexes, Exhibits and the Disclosure Schedules | 28 |
|    | (n) | Specific Performance | 28 |
|    | (o) | Submission to Jurisdiction | 29 |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of August __, 2007, by and between Abacus America, Inc., d/b/a APlus.net, a California corporation ("Buyer"), and TSV Group, Inc., a Delaware corporation ("Seller"). Each of Buyer and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

This Agreement contemplates a transaction in which Buyer will purchase from Seller all of its assets used to promote, market, use and sell web template products ("Products") in connection with Seller's "Web Image" business unit (the "Business") in return for cash, and assume certain liabilities from and after the Closing Date (as defined below).

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows.

1.   Definitions

"Acquired Assets" means all property used by Seller in the Business, including, without limitation, (a) the Products, (b) the Tangible Personal Property, (c) the Business Intellectual Property, (d) the Contracts, (e) the Receivables, and (f) the Permits; *provided* that notwithstanding the above, the Acquired Assets shall not include the Excluded Assets.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Affiliated Group" means any affiliated group within the meaning of Code Section 1504(a) or any similar group defined under a similar provision of state, local, or foreign law.

"Assumed Liabilities" means all obligations of Seller under the Contracts either (a) to furnish goods and services to another Person after the Closing or (b) to pay for goods and services that another Person will furnish after the Closing, *provided* that notwithstanding the above, the Assumed Liabilities shall not include the Excluded Liabilities. For avoidance of doubt, the Liabilities listed on Annex A hereto shall be deemed the Assumed Liabilities.

"Bankruptcy and Equity Exception" has the meaning set forth in Section 3(b) below.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"Business" has the meaning set forth in the preface above.

"Business Intellectual Property" has the meaning set forth in Section 3(I) below.

"Buyer" has the meaning set forth in the preface above.

"Buyer Indemnified Party" and "Buyer Indemnified Parties" have the meanings set forth in Section 5(b) below.

"Cash" means cash and cash equivalents (including marketable securities and short term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"Claims" means the claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set-off, and rights of recoupment (including any such item relating to the payment of Taxes) relating to the Business (excluding those pertaining solely to the Excluded Assets), including, without limitation, those set forth on Annex B attached hereto.

"Closing" has the meaning set forth in Section 2(d) below.

"Closing Date" has the meaning set forth in Section 2(d) below.

"COBRA" means Part 6 of Subtitle B of Title 1 of ERISA, Code Section 4980B, and any similar state law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means any information concerning the Business or the Acquired Assets that is not already generally available to the public.

"Contracts" means the agreements, contracts, instruments, Liens, guaranties, customer orders, purchase orders, dealer and distributorship agreements, supply agreements, development agreements, licenses, sublicenses, joint venture agreements, agreements with any Governmental Entity, collective bargaining agreements, lease agreements, mortgage agreements, pledge agreements, agency agreements, promotion agreements, partnership agreements, insurance and reimbursement agreements and other agreements, arrangements or commitments of Seller relating to the Business or the Acquired Assets (including any rights thereunder), including, without limitation, those set forth on Annex C attached hereto, but excluding (a) those pertaining solely to the Excluded Assets and (b) this Agreement.

"Controlled Group" has the meaning set forth in Code Section 1563.

"Damages" has the meaning set forth in Section 5(b) below.

"Disclosure Schedules" has the meaning set forth in Section 3 below.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3)) and any other employee benefit plan, program or arrangement of any kind, at any time maintained, sponsored or contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any Liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that, with Seller, is considered a single employer under Code Section 414.

"Escrow Agent" has the meaning set forth in Section 2(c) below.

"Escrow Amount" has the meaning set forth in Section 2(c) below.

"Excluded Assets" means (a) Seller's corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and

other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of Seller as a corporation, (b) any assets, contracts or records related to or maintained in connection with any Employee Benefit Plan, (c) all of Seller's Cash as of the Closing Date, and (d) any of the rights of Seller under this Agreement.

"Excluded Liabilities" means any and all Liabilities relating to or arising out of the conduct of the Business prior to the Closing, and any other Liabilities of Seller or any of its Subsidiaries or Affiliates whether or not related to the Business, that are not specifically identified herein as Assumed Liabilities, including, without limitation, (i) any Liability of seller arising out of or relating to, directly or indirectly, any infringement, misappropriation or violation of the Intellectual Property rights of any Person, (ii) any Liability of Seller to employees or former employees of Seller, (iii) unless specifically identified herein as an Assumed Liability, any Liability arising under any agreement or instrument prior to Closing or incurred as a result of an action taken by any party thereto prior to Closing (including any Liability related to or arising out of any breach or default thereunder), (iv) any Liability of Seller relating to products, products liability or product warranties, (v) any Liability of Seller for returns, chargebacks, rebates, allowances or credits relating to Products sold prior to the Closing, (vi) any Liability of Seller for Taxes (with respect to the Acquired Assets or otherwise), including, without limitation, any Liability of Seller for the unpaid Taxes of any Person under Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract or otherwise, (vii) any Liability of Seller for income, transfer, sales, use, and other Taxes arising in connection with the consummation of the transactions contemplated hereby (including any income Taxes arising because Seller is transferring the Acquired Assets), (viii) any Liability of Seller under any bulk transfer law of any jurisdiction, under any common law doctrine of de facto merger or successor liability, or otherwise by operation of law, (ix) any obligation of Seller to indemnify any Person by reason of the fact that such Person was a director, officer, employee, or agent of Seller or any of its Subsidiaries or Affiliates and was serving at the request of any such entity as a partner, trustee, director, officer, employee, or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise), (x) any Liability of Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, (xi) any Liability of Seller or any ERISA Affiliate arising under or in connection with or related to any Employee Benefit Plan, including, without limitation, any Liability arising under COBRA or Title IV of ERISA, and (xii) any Liability or obligation of Seller under this Agreement. For the avoidance of doubt, the Liabilities listed on Annex D attached hereto shall be deemed Excluded Liabilities.

"Financial Statements" has the meaning set forth in Section 3(f) below.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Entity" means any federal, state, local or foreign governmental or regulatory authority, agency, commission, body or other governmental entity.

"Indemnified Party" has the meaning set forth in Section 5(d) below.

"Indemnifying Party" has the meaning set forth in Section 5(d) below.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks,

service marks, trade dress, logos, slogans, trade names, corporate names, Internet domain names and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes, standard operating procedures and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) all advertising and promotional materials, (f) all other proprietary rights, and (g) all copies and tangible embodiments thereof (in whatever form or medium).

"Knowledge" or "aware" means, when used in reference to any Party to this Agreement, the actual knowledge of the directors, officers, and key employees of such Party and in the case of Seller, shall include Felix Rodriguez, John Holmes and Axel Coym.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and due or to become due), including any liability for Taxes.

"Lien" means any mortgage, pledge, lien, encumbrance, charge, or other security interest other than (a) liens for Taxes not yet due and payable, (b) purchase money liens and liens securing rental payments under capital lease arrangements, and (c) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Material Adverse Effect" or "Material Adverse Change" means any change, development or effect that has been, or could reasonably be expected to be, materially adverse to the business, property, condition (financial or otherwise), operating results, operations, earnings, customer or supplier relations, employee relations or business prospects of the Business or the Acquired Assets, taken as a whole, or on the ability of Seller to consummate timely the transactions contemplated hereby (regardless of whether or not such adverse effect or change can be or has been cured at any time or whether Buyer has knowledge of such effect or change on the date hereof).

"Most Recent Financial Statements" has the meaning set forth in Section 3(f) below.

"Most Recent Fiscal Month End" has the meaning set forth in Section 3(f) below.

"Most Recent Fiscal Year End" has the meaning set forth in Section 3(f) below.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Party" has the meaning set forth in the preface above.

"Permits" means the franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights and obligations obtained from Governmental Entities relating to the Business and all applications therefor currently pending.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Entity.

"Proceeding" has the meaning set forth in Section 3(i) below.

"Products" has the meaning set forth in the preface above.

"Purchase Price" means an amount equal to Two Million Four Hundred Thousand Dollars ($2,400,000).

"Receivables" means all receivables arising from the Business.

"Registered Business Intellectual Property" has the meaning set forth in Section 3(k)(iv) below.

"Seller" has the meaning set forth in the preface above.

"Seller Indemnified Party" and "Seller Indemnified Parties" have the meanings set forth in Section 5(c) below.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair market value of the assets of such Person is greater than the total amount of Liabilities (including contingent Liabilities) of such Person, (b) the present salable value of the assets of such Person is greater than the amount that will be required to pay the probable Liabilities of such Person on its debts as they become absolute and matured, and (c) such Person is able to realize upon its assets and pay its debts and other Liabilities, including contingent obligations, as they mature.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tangible Personal Property" means all tangible personal property used in or otherwise related to the Business (such as promotional material in physical form and camera-ready artwork, machinery, equipment, furniture, vehicles, tools, instruments, spare parts, pallets, office and laboratory equipment, materials, fuel, and other tangible personal property ) including, without limitation, the tangible personal property listed on Annex E attached hereto.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" has the meaning set forth in Section 5(d) below.

2.  Basic Transaction.

(a)  Purchase and Sale of Assets.  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, assign, convey, and deliver to Buyer, free and clear of all Liens, the Acquired Assets at the Closing for the consideration specified below in Section 2(c).

(b)  Assumption of Liabilities.  On and subject to the terms and conditions of this Agreement, Buyer agrees to assume and become responsible for all of the Assumed Liabilities at the Closing; provided, however, Buyer will not assume or have any responsibility with respect to any Excluded Liabilities.

(c)  Purchase Price.  On and subject to the terms and conditions of this Agreement, Buyer agrees to pay (i) to Seller the Purchase Price minus the Escrow Amount at the Closing by delivery of cash payable by wire transfer or delivery of other immediately available funds and (ii) to U.S. Bank National Association as escrow agent (the "Escrow Agent"), One Million Two Hundred Thousand Dollars ($1,200,000) (the "Escrow Amount") at the Closing by delivery of cash by wire transfer or delivery of other immediately available funds for deposit into the escrow.  The Escrow Amount plus any interest accrued thereon will be available to satisfy any amounts owed by Seller to Buyer pursuant to Section 5 below in accordance with the terms of the Escrow Agreement attached hereto as Exhibit I.

(d)  Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place before 5:00 p.m. Central Time on the date hereof (the "Closing Date").

(e)  Deliveries at Closing.  At the Closing, (i) Seller will execute and deliver to Buyer (A) a certificate of the secretary of Seller affirming that no third party consents are required in connection with any Contract or other Acquired Asset, the Business, or the transactions contemplated hereunder; (B) a certificate of the secretary of Seller certifying the status of all corporate governance documents, the good-standing status of Seller, proper authorization of this Agreement and the incumbency of the officers of Seller; (C) all forms of assignment of all patents, trademarks, service marks, copyrights and applications for any of the foregoing included in the Registered Business Intellectual Property suitable for recordation in the relevant U.S. or foreign government offices, and any document required to transfer any of the domain name registrations included in the Business Intellectual Property; (D) all reasonably necessary tax clearances, payor letters and lien releases; (E) a signed counterpart of the Transition Services Agreement on the form attached hereto as Exhibit II; (F) a signed counterpart of the Escrow Agreement in the form attached hereto as Exhibit I; (G) a signed counterpart of the Assignment and Assumption Agreement in the form attached hereto as Exhibit III; (H) a signed counterpart of the Bill of Sale in the form attached hereto as Exhibit IV; (I) all usernames and passwords for the Seller's subscription agreements with Getty Images, Inc., Shutterstock, Inc., and Jupiterimages (a.k.a. Comstock); and (H) such other certificates and instruments of sale, transfer, conveyance, and assignment as Buyer and its counsel reasonably may request; and (ii) Buyer will execute and deliver to Seller (A) a signed counterpart of the Transition Services Agreement on the form attached hereto as Exhibit II; (B) a signed counterpart of the Escrow Agreement in the form attached hereto as Exhibit I; (C) a signed counterpart of the Assignment and Assumption Agreements in the form attached hereto as Exhibit III and (D) such other instruments of assumption as Seller and its counsel reasonably may request.

(f) <u>Sales and Transfer Taxes</u>. All sales and transfer taxes, fees and duties under applicable law incurred in connection with this Agreement or the transactions contemplated hereby shall be borne and paid equally by Seller and Buyer. The Parties agree to cooperate to avoid or minimize any sales, use or other transfer taxes due in connection with the transfer of the Acquired Assets.

(g) <u>Allocation</u>. The Parties shall mutually prepare an allocation of the Purchase Price (and all other capitalized costs) among the Acquired Assets in accordance with Code Section 1060 and the Treasury regulations thereunder (and any similar provision of state, local or foreign law, as appropriate), within ninety (90) days after the Closing Date. Buyer and Seller and their Affiliates shall report, act and file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by Buyer. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Buyer may reasonably request to allow the parties to prepare such allocation. Neither Buyer nor Seller shall take any position (whether in audits, tax returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable law.

(h) <u>Working Capital Adjustment</u>. Within thirty (30) days after the Closing Date, Seller shall prepare and deliver to Buyer a statement of the closing net working capital balance as prepared in accordance with the procedures set forth in <u>Annex F</u> (the "<u>Closing Net Working Capital Balance</u>") of the Business as of the opening of business on the Closing Date (the "<u>Statement of Closing Net Working Capital Balance</u>"). The Statement of Closing Net Working Capital Balance shall be prepared in accordance with GAAP based upon the books and records related to the Business, consistent with the principles and procedures used in preparing the Most Recent Balance Sheet. Buyer, and any accountants or advisors retained by Buyer, shall be permitted to review Seller's working papers related to the preparation of such Statement of Closing Net Working Capital Balance and the books and records of Seller related to the Business for the purposes of reviewing such statement.

(i)    All components of the Statement of Closing Net Working Capital Balance shall be final and binding on the Parties unless Buyer shall, within ninety (90) days following the delivery of the Statement of Closing Net Working Capital Balance, deliver to Seller written notice of any disagreement with such statements, which notice(s) shall describe the nature of any such disagreement in reasonable detail, identify the specific items involved and the dollar amount of each such disagreement, in which case all undisputed items shall be final and binding on the Parties. If Buyer raises any objections within the aforesaid ninety (90) day period, then Buyer and Seller shall attempt in good faith to resolve the disputed matter.

(ii)    If Buyer and Seller are unable to resolve all disagreements within thirty (30) days of receipt by Seller of a written notice of disagreement, or such longer period as may be agreed by Buyer and Seller, then, within ten (10) days thereafter, Buyer and Seller shall jointly select an arbiter from a nationally recognized independent public accounting firm that is not the independent auditor of any of Buyer, Seller or any of their respective Subsidiaries, or Seller's controlling shareholders. If Buyer and Seller are unable to select an arbiter within such time period, the American Arbitration Association shall make such selection (the Person so selected shall be referred to herein as the "<u>Accounting Arbitrator</u>"). The Accounting Arbitrator so selected will consider only those items and amounts set forth in the Statement of Closing Net Working Capital Balance as to which Buyer and Seller remain in disagreement (all other items being final and binding on the Parties as agreed to thereby) and must resolve the matter in accordance with the terms and provisions of this Agreement. In submitting a dispute to the Accounting Arbitrator, each of the Parties shall concurrently furnish, at its own respective expense, to the Accounting Arbitrator and the other Party such documents and information as the Accounting Arbitrator may request. Each Party may also furnish to the Accounting Arbitrator

such other information and documents as it deems relevant, with copies of such submission and all such documents and information being concurrently given to the other Party. Neither Party shall have or conduct any communication, either written or oral, with the Accounting Arbitrator without the other Party either being present or receiving a concurrent copy of any written communication. The Accounting Arbitrator may conduct a conference concerning the objections and disagreements between Seller and Buyer, at which conference each Party shall have the right to (i) present its documents, materials and other evidence (previously provided to the Accounting Arbitrator and the other Party), and (ii) have present its advisors, accountants, counsel and other representatives. The Accounting Arbitrator shall resolve each item of disagreement based solely on the presentations and supporting material provided by the Parties and not pursuant to any independent review (the foregoing, however, shall not preclude the Accounting Arbitrator from independent research of facts or determining proper application of GAAP or the terms of this Agreement with respect to the subject matter of the objections and disagreement between the Parties). The Accounting Arbitrator shall issue a detailed written report that sets forth the resolution of all items in dispute and that contains the final Statement of Closing Net Working Capital Balance according to the dispute(s) noticed. Such report shall be final and binding upon Buyer and Seller. The Accounting Arbitrator may choose to circulate a preliminary report(s) for the comment of the Parties. The fees and expenses of the Accounting Arbitrator incurred in connection with the determination of the disputed items by the Accounting Arbitrator shall be borne proportionately by Buyer and Seller on the basis of the discrepancy (in dollars) between such Party's determination of the items in dispute (in the aggregate) as presented to the Accounting Arbitrator and the final binding determination of such disputed items by the Accounting Arbitrator. Buyer and Seller shall, and shall cause their respective Affiliates to, cooperate fully with the Accounting Arbitrator and respond on a timely basis to all requests for information or access to documents or personnel made by the Accounting Arbitrator or by other Parties hereto, all with the intent to fairly and in good faith resolve all disputes relating to the Statement of Closing Net Working Capital Balance as promptly as reasonably practicable.

(iii)    If the amount representing Closing Net Working Capital Balance as reflected in the Statement of Closing Net Working Capital Balance as finally determined in accordance with this Section 2 is less than the estimated Closing Net Working Capital Balance provided as of the Closing, the Purchase Price shall be deemed decreased on a dollar-for-dollar basis by the amount of such shortfall and Seller shall pay Buyer the amount of such shortfall within five (5) Business Days after the final determination of the Closing Net Working Capital Balance pursuant to this Section 2. If the amount representing Closing Net Working Capital Balance as reflected in the Statement of Closing Net Working Capital Balance as finally determined is greater than the Estimated Closing Net Working Capital Balance, the Purchase Price shall be deemed increased on a dollar-for-dollar basis by the amount of such excess and Buyer shall pay Seller the amount of such excess within five (5) Business Days after the final determination of the Closing Net Working Capital Balance pursuant to this Section.

3.    Seller's Representations and Warranties.    Seller represents and warrants to Buyer that the statements contained in this Section 3 are true, correct and complete as of the date hereof, except as set forth in the corresponding section of the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 3.

(a)    Organization of Seller.

(i)    Seller is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation with full power and authority to own or

lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it. The copies of the charter documents of Seller, as amended to date, and the bylaws of Seller, as amended to date, and heretofore delivered to Buyer's counsel, are complete and correct, and no amendments thereto are pending. Seller is qualified to do business as a foreign corporation in each jurisdiction in which such qualification is necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

(ii)    None of the Business is conducted by, and none of the Acquired Assets are owned, controlled, leased or held by any Subsidiaries or Affiliates of Seller.

(b) Authorization of Transaction. Seller has full right, power and authority (including full corporate power) to execute and deliver this Agreement and each agreement, document and instrument to be executed and delivered by it pursuant to or contemplated by this Agreement (each, a "Seller Related Document") and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and each Seller Related Document has been duly authorized by all necessary corporate action of Seller, and no other action on the part of Seller is required in connection therewith. This Agreement and each Seller Related Document constitute, or when executed and delivered by Seller will constitute, the valid and legally binding obligations of Seller, enforceable in accordance with their respective terms and conditions, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief and other equitable remedies (the "Bankruptcy and Equity Exception").

(c) No Conflicts; No Bankruptcy. Neither the execution and the delivery of this Agreement or the Seller Related Documents, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Entity to which Seller is, or its assets or properties are, subject, (ii) contravene, conflict with or result in a breach or violation of any provision of the charter or bylaws of Seller, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify, or cancel, or require any authorization, consent or notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its property is subject (or result in the imposition of any Lien upon any of the Acquired Assets). Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Entity or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement. There is no proceeding pending or, to the Knowledge of Seller, threatened against Seller that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement. Seller was Solvent before, and will be Solvent after, the consummation of the transactions contemplated hereby. No order has been entered or petition presented for the winding up, insolvency, liquidation, or bankruptcy of Seller.

(d) Brokers' Fees. Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

(e) Title to Assets; Sufficiency of Assets.

(i)    Seller has good and marketable title to the Acquired Assets, including an enforceable right, with the ability to freely use and transfer, the intangible portion of the Acquired Assets, including those listed on Annex G, free and clear of all Liens or other restrictions on

transfer, and Seller will convey at the Closing good and marketable title to all of Acquired Assets, free and clear of all Liens.

(ii)    The Acquired Assets attached hereto are all of Seller's assets used in the operation of the Business and constitute all of the assets necessary for or material to the operation of the Business.

(f) Financial Statements. Attached hereto as Exhibit V are the following financial statements (collectively the "Financial Statements"): (i) the September 30, 2006 (the "Most Recent Fiscal Year End"), and the related consolidated statements of income for the fiscal years ended September 30, 2006, which in each case reflect the Business on a consolidated basis (the "Audited Financial Statements"); and (ii) the consolidated unaudited balance sheet of Seller (the "Most Recent Balance Sheet") as of May 31, 2007 (the "Most Recent Fiscal Month End"), and the related consolidated statements of income of Seller for the three months ended May 31, 2007, which in each case reflect the Business on a consolidated basis (collectively, the "Most Recent Financial Statements"). The Financial Statements (including the notes thereto) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, present fairly the financial condition of Seller (including the Business on a consolidated basis) as of such dates and the results of operations of Seller (including the Business on a consolidated basis) for such periods, subject, in the case of the Most Recent Financial Statements, to year-end audit adjustments.

(g) Events Subsequent to Most Recent Fiscal Year End. Since the Most Recent Fiscal Year End, there has not been any Material Adverse Change. Without limiting the generality of the foregoing except as set forth on Section 3(a) of the Disclosure Schedule, since that date:

(i)    Seller has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, relating to or used in the Business or that would have otherwise constituted part of Acquired Assets, other than for a fair market value in the Ordinary Course of Business;

(ii)    Seller has not entered into any material agreement, contract, lease, or license relating to the Business or the Acquired Assets, except in the Ordinary Course of Business;

(iii)    no Person (including Seller) has accelerated, terminated, modified, or canceled any material agreement, contract, lease, or license relating to the Business or the Acquired Assets to which Seller is a party or by which it is bound, except in the Ordinary Course of Business;

(iv)    Seller has not made or entered into any oral or written guaranties related to the Business or the Acquired Assets;

(v)    Seller has not made or entered into any oral or written Agreements with any Affiliate;

(vi)    Seller has not discounted, marked down or made any price reductions with respect to any products or services of the Business, except in the Ordinary Course of Business;

(vii)    Seller has not imposed or permitted to exist any Lien upon any of its property, tangible or intangible, relating to the Business or the Acquired Assets;

(viii)    Seller has not accelerated any billing of customers or collection of receivables;

(ix)     Seller has not delayed or postponed the payment of accounts payable or other Liabilities relating to the Business or the Acquired Assets outside the Ordinary Course of Business;

(x)     Seller has not issued an invoice to any third party prior to the delivery of the product or service to which such invoice relates;

(xi)     Seller has not canceled, compromised, waived, or released any right or claim (or series of related rights and claims) relating to the Business or the Acquired Assets involving more than $10,000;

(xii)     Seller has not transferred, assigned, or granted any license or sublicense of any rights under or with respect to any Intellectual Property relating to the Business or the Acquired Assets;

(xiii)     Seller has not licensed any Intellectual Property relating to the Business or the Acquired Assets from any third party;

(xiv)     Seller has not failed to take any action necessary or customary in accordance with reasonable industry practice to maintain, renew, or protect any Intellectual Property relating to the Business or the Acquired Assets;

(xv)     Seller has not experienced any damage, destruction, or loss (whether or not covered by insurance) affecting any of its properties or assets relating to the Business or the Acquired Assets;

(xvi)     Seller has not materially changed any of the types or levels of support services provided to the Business by Seller in the conduct of the Business;

(xvii)     there has not been any change in the kind and amount of insurance maintained by Seller relating to the Business;

(xviii)     Seller has not discharged a material Liability or Lien relating to the Business or the Acquired Assets;

(xix)     there has not been any change in the Seller's accountants or in the manner of keeping books, accounts or records, accounting methods or practices, standard costs, credit practices or collection or pricing policies used by Seller relating to the Business;

(xx)     Seller has not disclosed any Confidential Information relating to the Business or the Acquired Assets, except in the Ordinary Course of Business and pursuant to written agreements obligating the recipient to maintain the confidentiality thereof;

(xxi)     there has not been any other material occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving Seller relating to the Business or the Acquired Assets; and

(xxii)     Seller has not committed to do any of the foregoing.

(h)  Undisclosed Liabilities.  Seller does not have any Liability relating to the Business or the Acquired Assets (and there is no Basis for any present or, to the Knowledge of Seller, future action, suit,

proceeding, hearing, investigation, charge, complaint, claim, or demand giving rise to any such Liability), except for (i) Liabilities set forth on the face of the balance sheet for the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) Liabilities which have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law).

(i)  Legal Compliance.

(i)  Each of Seller and its predecessors and Affiliates has complied with all applicable laws (including rules, statutes, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of all Governmental Entities, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice (a "Proceeding") has been filed or commenced against any of them alleging any failure to so comply.

(ii)  Section 3(i)(ii) of the Disclosure Schedule sets forth each instance relating to the Business or any of the Acquired Assets in which Seller (A) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (B) is a party or, to the knowledge of Seller, is threatened to be made a party to any Proceeding of, in, or before any court, arbitrator or Governmental Entity.  None of the Proceedings set forth in Section 3(i)(ii) of the Disclosure Schedule will result in any Liability to Buyer.  Seller has no Basis to believe that any other such Proceeding may be brought or threatened against Seller or that there is a Basis for the foregoing.

(j)  Tax Matters.

(i)  Seller has timely filed all Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all respects.  All Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been paid.  Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by any Governmental Entity in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.  There are no Liens on any of the Acquired Assets that arose in connection with any failure (or alleged failure) to pay any Tax.

(ii)  Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(iii)  Seller does not expect any Governmental Entity to assess any additional Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any Tax Liability of Seller either (A) claimed or raised by any Governmental Entity in writing or (B) as to which Seller or the directors and officers (and employees responsible for Tax matters) of Seller has any Knowledge.

(iv)  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(v)  Seller is not a party to any Tax allocation or sharing agreement that could result in any Liability to Buyer.  Seller (A) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return and (B) has no Liability for the Taxes of any Person

under Reg. Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise that could result in any Liability to Buyer.

(k)    Properties.

(i)    Except as set forth in Section 3(k) of the Disclosure Schedule, Seller does not own or lease or otherwise occupy or use any Real Property as of the date hereof that could reasonably be expected to be necessary to Buyer for the operation of the Business after the Closing Date.

(ii)    Section 3(k) of the Disclosure Schedule lists the addresses of all Real Property that is leased, subleased, licensed, or otherwise used or occupied by Seller as of the date hereof and that is necessary for the operation of the Business (other than the Excluded Assets) (the "Leased Real Property"). Seller has delivered to Buyer copies of all of the Real Property Leases, which copies are true and complete, and in the case of any oral Real Property Lease, a written summary of the material terms of such lease or agreement. Except as disclosed in Section 3(k) of the Disclosure Schedule:

(A) each of the Real Property Leases is valid, binding and currently in full force and effect;

(B) to the Knowledge of Seller, no default or preemptive right by any landlord under any Real Property Lease, after applicable grace periods, if any, exists as of the date hereof; and

(C) Seller has not received any written notice alleging a default by Seller under any Real Property Lease and (y) there are no defaults by Seller under any Real Property Lease that would entitle a landlord thereunder to terminate such Real Property Lease, and (z) to the Knowledge of Seller, no event has occurred which, through the passage of time or the giving of notice, or both, would constitute a default by Seller or any other party to such Real Property Lease.

(iii)    The Leased Real Property, and the continued use, occupancy and operation thereof as currently used, occupied and operated by Seller do not, to the Knowledge of Seller, violate any applicable building, zoning, subdivision, other land use and similar laws, regulations and ordinances or any license, franchise, permit, certificate, approval or other similar authorization of a Governmental Entity.

(iv)    Seller has marketable title to, or a valid leasehold interest in all of the Acquired Assets free and clear of any Liens, except for Liens reflected in the Most Recent Balance Sheet. No Person, other than Seller, owns or has a valid leasehold interest in any property, rights or assets (real, personal or mixed, tangible or intangible) which are used primarily in or otherwise relate primarily to the Business.

(v)    Seller's possession and quiet enjoyment of the Leased Real Property under the Real Property Leases has not been disturbed and, to Seller's Knowledge, there are no disputes with respect to such Real Property Leases.

(vi)    No security deposit or portion thereof deposited with respect any Real Property Lease has been applied in respect of a breach or default under such lease which has not been redeposited in full. Neither Seller nor any of its Subsidiaries owes, or will in the future owe, any brokerage commissions or finder's fees with respect to any Real Property Leases.

(vii)    Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof. Neither Seller nor any of its Subsidiaries has

collaterally assigned or granted any other security interest in Real Property Lease or any interest therein and there are no liens or encumbrances on the estate or interest created by such Real Property Lease.

(viii)    Seller has good and marketable title to the Leasehold Improvements, free and clear of all Liens and, other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase any such Leasehold Improvements or any portion therein.

(l)    Intellectual Property.

(i)    Seller owns all right, title and interest in and to, or has the right to use pursuant to a valid and enforceable contract all of the Intellectual Property listed on Annex H attached hereto and all Intellectual Property necessary for the operation of the Business.  The Intellectual Property set forth on Annex H attached hereto constitutes all Intellectual Property necessary for or material to the operation of the Business (the "Business Intellectual Property").  Each item of Business Intellectual Property owned or used by Seller with respect to the Business immediately prior to the Closing will be owned or available for use by Buyer on identical terms and conditions immediately subsequent to the Closing.  Seller has taken all action necessary or customary in accordance with reasonable industry practice to maintain and protect all current federal, state and foreign registrations or applications pertaining to any of the Business Intellectual Property.

(ii)    Seller follows reasonable commercial practices common in the industry to protect its proprietary and confidential information, including requiring its employees, consultants and agents to be bound in writing by obligations of confidentiality and non-disclosure, and requiring its employees, consultants and agents to assign to it any and all inventions and discoveries and other Intellectual Property conceived, reduced to practice, developed or discovered by such employees, consultants and/or agents made within the scope of, and during their employment (to the extent permitted by law) pursuant to written agreements executed by each such employee, consultant or agent, and only disclosing proprietary and confidential information to third parties pursuant to written confidentiality and non-disclosure agreements.

(iii)    The conduct of the Business has not and, to the Knowledge of Seller, as of the Closing Date, will not interfere with, infringe upon, misappropriate, or otherwise come into conflict with any Intellectual Property rights of any third parties, and Seller has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or other conflict (including any claim or written notice that Seller must license or refrain from using any Intellectual Property rights of any Person) and Seller is not aware of any Basis for the same.  To the Knowledge of Seller, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Business Intellectual Property, and no licensee or sublicensee of Seller has provided Seller with any information of any of the foregoing by such licensee or sublicensee in connection with such licensee's or sublicensee's practice of any Intellectual Property licensed or sublicensed to it by Seller.

(iv)    Annex H attached hereto identifies (A) each patent or registration which has been issued to Seller with respect to any of the Business Intellectual Property and each pending patent application or application for registration which Seller has made with respect to any of the Business Intellectual Property (collectively, the "Registered Business Intellectual Property"), and (B) each license, sublicense, agreement, or other permission which Seller has granted to any third party with respect to any of the Business Intellectual Property (together with any exceptions). Seller has made available to Buyer correct and complete copies of all such patents, registrations, applications, licenses, sublicenses, agreements, and permissions (as amended to date) and has

made available to Buyer correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item. Annex H attached hereto also identifies each material unregistered trademark, material unregistered service mark, trade name, corporate name or Internet domain name, computer software item (other than commercially available off-the-shelf software purchased or licensed for less than a total per seat cost of $500) and each material unregistered copyright used by Seller in connection with the Business. Except as otherwise set forth in Section 3(l)(iv) of the Disclosure Schedule, with respect to each item of the Business Intellectual Property, including the Registered Business Intellectual Property:

   (A) Seller owns and possesses all right, title, and interest in and to the item, free and clear of any Lien, license, or other restriction or limitation regarding use or disclosure;

   (B) the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

   (C) each such item is valid and enforceable and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened which challenges the legality, validity, enforceability, use, or ownership of the item, and there are no grounds for the same;

   (D) Seller has never agreed to indemnify any Person for or against any interference, infringement, misappropriation, or other conflict with respect to the item; and

   (E) no loss or expiration of the item is threatened, pending, or reasonably foreseeable, except for patents expiring at the end of their statutory terms (and not as a result of any act or omission by Seller, including without limitation, a failure by Seller to pay any required maintenance fees).

  (v) Section 3(l)(v) of the Disclosure Schedule identifies each item of Intellectual Property that any third party owns and that Seller uses or holds for use in the Business as currently conducted and as proposed to be conducted pursuant to license, sublicense, agreement, or permission. Seller has delivered to Buyer correct and complete copies of all such licenses (including shrinkwrap licenses and licenses for images and stock photography), sublicenses, agreements, and permissions (as amended to date). With respect to each item of Intellectual Property required to be identified on Annex H attached hereto, except as set forth in Section 3(l)(v) of the Disclosure Schedule, Seller has not granted any sublicense or similar right with respect to the license, sublicense, agreement, or permission. With respect to each item of Intellectual Property required to be identified Annex H attached hereto:

   (A) the license, sublicense, agreement, or permission covering the item is legal, valid, binding, enforceable, and in full force and effect;

   (B) the license, sublicense, agreement, or permission will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following consummation of the transactions contemplated hereby;

(C) no party to the license, sublicense, agreement, or permission is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification, or acceleration thereunder;

(D) no party to the license, sublicense, agreement, or permission has repudiated any provision thereof;

(E) with respect to each sublicense, the representations and warranties set forth in subsections (A) through (D) above are true and correct with respect to the underlying license;

(F) the underlying item of Intellectual Property is not subject to any outstanding attachment, injunction, judgment, order, decree, ruling, or charge; and

(G) each such item is valid and enforceable and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened that challenges the legality, validity, or enforceability of the underlying item of Intellectual Property, and there are no grounds for the same.

(vi)     Seller has complied in all material respects with and is presently in compliance in all material respects with all foreign, federal, state, local, governmental, administrative or regulatory laws, regulations, guidelines and rules applicable to any Business Intellectual Property and the conduct of the Business and Seller shall take all steps necessary to ensure such compliance until the Closing.

(m)     <u>Systems.</u>

(i)     The computer systems, including the software, firmware, hardware, networks, interfaces, platforms and related systems used or currently planned to be used in the conduct of the Business (collectively, "<u>Systems</u>") are sufficient for the immediate and anticipated future needs of Business, as currently contemplated, including as to capacity, scalability and ability to process current and anticipated peak volumes in a timely manner. The Systems are in good working condition to effectively perform all information technology operations necessary for the Business. All Systems, other than software, used in the Business are owned and operated by and are under the control of Seller and are not wholly or partly dependent on any facilities which are not under the ownership, operation or control of Seller.

(ii)     Except as set forth on Section 3(m)(ii) of the Disclosure Schedule, in the twelve-month (12) period prior to the date hereof, there have been no failures, breakdowns or continued substandard performance of any Systems that has caused substantial disruption or interruption in or to any customer's use of the Systems or the operation of the Business. Seller has taken commercially reasonable steps to provide for the back-up and recovery of data and information critical to the conduct of the Business (including such data and information that is stored on magnetic or optical media in the ordinary course) without material disruption to, or material interruption in, the conduct of such business. Seller has in place commercially reasonable disaster recovery and business continuity plans, procedures and facilities, acts in compliance therewith and has taken commercially reasonable steps to test such plans and procedures on a periodic basis, and such plans and procedures have been proven effective upon such testing in all material respects.

(iii)     Seller is not individually or collectively a party to any agreement or arrangement, or otherwise subject to any duty, which (in either case) (i) restricts the Seller's free use or disclosure of

any source code relating to any of the Business Intellectual Property, or (ii) requires Seller to (x) include any source code relating to any Business Intellectual Property with any distribution or delivery (whether physical or on a hosted basis) of such software and/or (y) permit any licensee of the Business Intellectual Property to modify any source code relating to any of the Business Intellectual Property.

(iv)    Seller has not agreed to indemnify any third party from and against the use of any Systems.

(n)    Data Security and Privacy.  Except as set forth in Section 3(n) of the Disclosure Schedule, the Business is, and since the inception of Seller has been, in compliance with (i) all applicable laws concerning data protection, privacy and the collection or use of personal information; and (ii) any privacy policies or related policies, programs or other notices that concern the collection or use of personal information in the Business.  Except as set forth in Section 3(n) of the Disclosure Schedule, there have not been any incidents of data security breaches or complaints, notices to, or audits, proceedings or investigations conducted or claims asserted by any Person (including any Governmental Entity) regarding the collection, use, transmission or disclosure of personal information by any Person in connection with the Business or any violation of applicable law, and to the Knowledge of Seller, there is no reasonable basis for the same and no such claim has been threatened or pending.  Any event indicated on Section 3(n) of the Disclosure Schedule has not resulted in any litigation, claims, charges, fines, penalties, investigations or other actions that could reasonably be expected to have a Material Adverse Effect.

(o) Contracts.  Seller has delivered to Buyer a correct and complete copy of each Contract (as amended to date).  Other than the Contracts, Seller is not a party to or bound by any oral or written contract, agreement, license or other undertaking that relates to the Acquired Assets or otherwise to the Business, or which Buyer could reasonably be expected to have any Liability or other obligation after the Closing.  With respect to each such Contract: (i) such Contract is legal, valid, binding, enforceable, and in full force and effect; (ii) such Contract will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Section 2 above); (iii) the form of the Contract used by Seller with customers of the Business (as set forth in Section 3(o) of the Disclosure Schedule) is the same Contract used with all customers without any material changes thereto; (iv) no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under such Contract; and (v) no party has repudiated any provision of the Contract or provided the other party with any notice of default or other dispute or disagreement.

(p)    Labor Matters.  The Business is, and since its inception has been, in compliance with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours, and is not engaged in any unfair labor practice.  There are no claims pending, or to the knowledge of Seller, Threatened against Seller with respect to a Business employee.  There is no unfair labor practice complaint pending or, to the Knowledge of Seller, threatened against Seller with respect to any Business employee.  Seller is not a party to any collective bargaining agreement and, to the Knowledge of Seller, no union organizational or decertification activities are underway or threatened by, on behalf of or against any labor union with respect to any employees of Seller.  Section 3(q) of the Disclosure Schedule sets forth a true, complete and correct list of (i) all Business employees (as of the date hereof), and (ii) the position, date of hire, current annual rate of compensation (or with respect to employees compensated on an hourly or per diem basis, the hourly or per diem rate of compensation), including any bonus, contingent or deferred compensation.

(q)    Employee Benefit Plans.

(i)    Schedule 3(q)(i) identifies each Employee Benefit Plan and each other material program, agreement, arrangement or policy providing for compensation, bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, change in control benefits, severance benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits), or other employee benefits, in each case, which is either maintained, administered, sponsored or contributed to by the Seller or any of the Selling Subsidiaries or any ERISA Affiliate for the benefit of any Business Employee (each, a "Business Benefit Plan").

(ii)    None of the Business Benefit Plans is a (i) a single employer plan or other pension plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code, (ii) a "multi-employer plan" (within the meaning of Section 3(37) of ERISA), or (iii) a "multiple employer plan" (within the meaning of Section 413(c) of the Code). Neither the Seller nor any of the Selling Subsidiaries has any current or potential obligation or liability under Title IV of ERISA or Section 412 or COBRA (as defined below) that could become an obligation or liability of the Buyer or its Affiliates.

(iii)    No Business Benefit Plan provides benefits, including death or medical benefits (whether or not insured), with respect to employees or former employees of the Seller, the Selling Subsidiaries or the ERISA Affiliates beyond retirement or other termination of service, other than coverage required by Section 4980B of the Code and Sections 601 through 608 of ERISA (and, if applicable, comparable state Applicable Law) ("COBRA").

(iv)    Each of the Business Benefit Plans that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code is the subject of a favorable determination or opinion letter issued by the Internal Revenue Service after January 1, 1997, and nothing has occurred that could reasonably be expected to adversely affect the qualification of such Business Benefit Plan.

(v)    Each Business Benefit Plan has been maintained in substantial compliance with its terms and with the requirements prescribed by Applicable Law.

(r)    Environmental Matters.  Except as set forth in Section 3(r) of the Disclosure Schedule, with respect to the Business, Seller and its predecessors and Affiliates (i) have not transported, stored, treated, handled, released, exposed any Person to, and/or disposed of, or arranged for or permitted the disposal of, any materials, substances, pollutants, or contaminants regulated, or to be regulated, by any Governmental Entity ("Regulated Materials"), or owned, leased, or operated any property or facility where the release of any Regulated Material has occurred or is occurring, so as to give rise to any material Liability, including without limitation, investigative, corrective, or remedial obligations pursuant to any Government Entity requirement (and the Leased Real Property is neither subject to any claim regarding Regulated Materials nor ever been used as landfill or dumping area(s)), (ii) have obtained, and at all times complied with all applicable requisite Permits, and have at all times complied and remain in compliance with all requirements of Governmental Entities for Regulated Materials, (iii) have not received any notice from any Governmental Entity of any Liability for any matter involving Regulated Materials, including any potential Liability, investigation, information request, Proceeding, or Order.  Seller has furnished to Buyer all environmental audits, reports and other material environmental documents relating to its or its Affiliates' or predecessors' past or current properties, facilities or operations with respect to the Business that are in their possession under their reasonable control.

(s)    Powers of Attorney.  There are no outstanding powers of attorney executed on behalf of Seller relating to the Business or involving the Acquired Assets.

(t) Insurance. The Acquired Assets are insured to the extent disclosed in Section 3(t) of the Disclosure Schedule and all insurance policies and arrangements of Seller relating to the Acquired Assets or the Business are disclosed in Section 3(t) of the Disclosure Schedule. Said insurance policies and arrangements are in full force and effect, all premiums with respect thereto are currently paid, and Seller is in compliance in all material respects with the terms of such policies. There is no claim by Seller pending under any such policies as to which coverage has been questioned, denied or disputed by the insurer. Each such insurance policy shall continue to be in full force and effect through the date of the Closing. To the Knowledge of Seller, such policies of insurance are of the type and in amounts customarily carried by persons conducting business similar to that of the Business.

(u) Litigation. Section 3(u) of the Disclosure Schedule sets forth each instance relating to the Business or any of the Acquired Assets in which Seller (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or, to the Knowledge of Seller, is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court, arbitrator or Governmental Entity. None of the actions, suits, proceedings, hearings, or investigations set forth in Section 3(u) of the Disclosure Schedule could result in any Liability to Buyer or a Material Adverse Change. Seller does not have any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against Seller or that there is a Basis for the foregoing.

(v) Certain Business Relationships With Seller. None of Seller's Subsidiaries, Seller's stockholders and their Affiliates, and Seller's and its Subsidiaries' directors, officers, employees, and stockholders has been involved in any business arrangement or relationship (other than the ownership of capital stock in the Seller) relating to the Business or the Acquired Assets with Seller within the past twelve (12) months, and none of Seller's Subsidiaries, Seller's stockholders and their Affiliates, and Seller's and its Subsidiaries' directors, officers, employees, and stockholders owns any asset, tangible or intangible, which is used in the Business.

(w) Customers and Suppliers.

(i)     Section 3(w) of the Disclosure Schedule lists each individual customer of the Business accounting for at least ten percent (10%) of the Business' revenues (on a consolidated basis) for the two most recent fiscal years (the "Customers").

(ii)    No material supplier of the Business has indicated that it shall stop, or materially decrease the rate of, supplying materials, products or services to the Business, and no Customer has indicated that it shall stop, or materially decrease the rate of, buying materials, products or services from the Business.

(x)     Accounts Receivable. All Accounts Receivable reflected on the Most Recent Balance Sheet are valid notes and accounts receivable, are not subject to set-offs or counterclaims, have been prepared from, and are in accordance with, the books and records of Seller, arose solely out of bona fide sales and delivery of goods and performance of services, and are current and collectible, subject only to the reserve for bad debts set forth on the Most Recent Balance Sheet. All Accounts Receivable reflected on the Statement of Closing Net Working Capital Balance will be valid notes and accounts receivable, will not be subject to set-offs or counterclaims, will have been prepared from, and are in accordance with, the books and records of Seller, will have arose solely out of bona fide sales and delivery of goods and performance of services, and will be current and collectible, subject only to the reserve for bad debts set forth on the Statement of Closing Net Working Capital Balance.

(y) <u>Disclosure</u>. The representations and warranties contained in this Section 3 do not contain any untrue statement of a fact or omit to state any fact necessary in order to make the statements and information contained in this Section 3 not misleading.

4. <u>Buyer's Representations and Warranties</u>. Buyer represents and warrants to Seller that the statements contained in this Section 4 are correct and complete as of the date hereof, except as set forth in the corresponding section of the Disclosure Schedule.

(a) <u>Organization of Buyer</u>. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation with full power and authority to own or lease its properties and to conduct its business in the manner and in the places where such properties are owned or leased or such business is conducted by it. Buyer is qualified to do business as a foreign corporation in each jurisdiction in which such qualification is necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

(b) <u>Authorization of Transaction</u>. Buyer has full right, power and authority (including full corporate power) to execute and deliver this Agreement and each agreement, document and instrument to be executed and delivered by it pursuant to or contemplated by this Agreement (each, a "<u>Buyer Related Document</u>") and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and each Buyer Related Document by Buyer has been duly authorized by all necessary corporate action of Buyer, and no other action on the part of Buyer is required in connection therewith. This Agreement and each Buyer Related Document constitute, or when executed and delivered by Buyer will constitute, the valid and legally binding obligations of Buyer, enforceable in accordance with their respective terms and conditions, except as the same may be limited by the Bankruptcy and Equity Exception.

(c) <u>No Conflict</u>. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Entity to which Buyer is, or its assets or properties are, subject, (ii) contravene, conflict with or result in a breach or violation of any provision of the charter or bylaws of Buyer, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify, or cancel, or require any authorization, consent or notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets). Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Entity or any other Person in order for the Parties to consummate the transactions contemplated by this Agreement.

(d)     <u>Brokers</u>. Except for Daniels & Associates L.P., which is a fully licensed and registered broker under applicable laws, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated under this Agreement based upon arrangements made by or on behalf of Buyer or any of its Affiliates.

5. <u>Remedies for Breaches of This Agreement</u>.

(a) <u>Survival of Representations and Warranties</u>.

All of the representations and warranties of Seller contained in Section 3 of this Agreement or in any certificate or instrument delivered pursuant to this Agreement shall survive the Closing (even if Buyer knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing)

and continue in full force and effect until the second anniversary of the Closing Date; *provided, however,* that the representations and warranties of Seller contained in (i) Section 3(j) above shall survive the Closing and continue in full force and effect until after the expiration of all applicable statutes of limitations, and (ii) Sections 3(a) through 3(d) above shall survive the Closing and continue in full force and effect forever thereafter.

(b) <u>Indemnification Provisions for Buyer's Benefit</u>. Seller shall indemnify Buyer and each of its officers, directors, agents, and each person, if any, who controls Buyer within the meaning of the Securities Act (each a "<u>Buyer Indemnified Party</u>" and collectively, the "<u>Buyer Indemnified Parties</u>") in respect of, and hold them harmless against, any and all debts, obligations and other Liabilities, monetary damages, fines, fees, penalties, interest obligations, deficiencies, losses and expenses (including without limitation amounts paid to enforce the provisions of this Section 5 and amounts paid in settlement, interest, court costs, costs of investigators, reasonable fees and out-of-pocket expenses of attorneys, accountants, financial advisors and other experts, and other expenses of litigation) ("<u>Damages</u>") incurred or suffered by any such Buyer Indemnified Party resulting from, relating to or constituting:

(i)     fraud, intentional misrepresentation or a deliberate or willful breach by Seller of any of its representations or warranties under this Agreement (including any representations or warranties deemed to have been made by the delivery of any certificate or instrument delivered pursuant to this Agreement);

(ii)     any other misrepresentation or breach of warranty of Seller contained in this Agreement (including any misrepresentation or breach of warranty deemed to have been made by the delivery of any certificate or instrument delivered pursuant to this Agreement), or by reason of any Proceeding asserted or instituted arising out of any matter constituting a breach of such representations or warranties (including any breach of any representations or warranties deemed to have been made by the delivery of any certificate or instrument delivered pursuant to this Agreement);

(iii)     any breach by Seller of any of its covenants under this Agreement;

(iv)     any Proceeding by any third party for damages suffered by a third party by reason of or resulting from (A) any Excluded Liability, (B) the ownership or operation of the Acquired Assets, Excluded Assets or the Business prior to the Closing, or (C) any actions taken or omitted to be taken by Seller prior to the Closing (other than Assumed Liabilities); or

(v)     any Excluded Liability.

(c) <u>Indemnification Provisions for Seller's Benefit</u>. Buyer shall indemnify Seller and each of its officers, directors, agents, and each person, if any, who controls Seller within the meaning of the Securities Act (each a "<u>Seller Indemnified Party</u>" and collectively, the "<u>Seller Indemnified Parties</u>") in respect of, and hold them harmless against, any and all Damages incurred or suffered by any of the foregoing parties resulting from, relating to or constituting:

(i)     fraud, intentional misrepresentation or a deliberate or willful breach by Buyer of any of its representations or warranties under this Agreement (including any representations or warranties deemed to have been made by the delivery of any certificate or instrument delivered pursuant to this Agreement);

(ii)     any other misrepresentation or breach of warranty of Buyer contained in this Agreement (including any misrepresentation or breach of warranty deemed to have been made by

the delivery of any certificate or instrument delivered pursuant to this Agreement), or by reason of any Proceeding asserted or instituted arising out of any matter constituting a breach of such representations or warranties (including any breach of any representations or warranties deemed to have been made by the delivery of any certificate or instrument delivered pursuant to this Agreement);

(iii)    any breach by Buyer of any of its covenants under this Agreement; or

(iv)    any Proceeding for damages suffered by a third party by reason of or resulting from (A) any Assumed Liability or (B) the ownership or operation of the Acquired Assets or the Business after the Closing.

(d)  Matters Involving Third Parties.

(i)    If any third party shall notify any Party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against the other Party (the "Indemnifying Party") under this Section 5, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced.

(ii)    The Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (A) the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Damages the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (B) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (C) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (D) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice materially adverse to the continuing business interests or the reputation of the Indemnified Party, and (E) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(iii)    So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 5(d)(ii) above, (A) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (B) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably), and (C) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably).

(iv)    In the event any of the conditions in Section 5(d)(ii) above is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any

consent from, the Indemnifying Party in connection therewith), (B) the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses), and (C) the Indemnifying Party will remain responsible for any Damages the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 5.

(e) <u>Maximum Indemnification Amount for Certain Claims</u>.   The maximum aggregate indemnification amount that shall be due from an Indemnifying Party for Damages pursuant to each of Sections 5(b)(ii) and 5(c), as applicable, shall not exceed the Purchase Price.

6.   <u>Post-Closing Covenants</u>.

(a) <u>General</u>.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as the other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Section 5 above).  Seller acknowledges and agrees that from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and financial data of any sort relating to the Business or the Acquired Assets; *provided*, however, that Seller may retain copies of such documents, books, records, agreements, and financial data.

(b) <u>Notification of Customers</u>.  Within sixty (60) days after the Closing Date, Buyer shall notify the customers of the Products that (i) Buyer has acquired, and Seller has transferred, the right to distribute, promote, market, use and sell the Products, and (ii) that all customer orders for the Products received by Seller on or prior to the Closing Date but not fulfilled as of such date will be transferred to Buyer.  After the Closing Date, Seller shall transfer to Buyer any customer order for the Products and any amounts paid with respect to the Products that Seller or any of its Affiliates receives, no later than three (3) business days after receipt, but using commercially reasonable efforts to transfer the order or payments, as the case may be, within twenty-four (24) hours after receipt.

(c) <u>Litigation Support</u>.  In the event and for so long as any Party actively is contesting or defending against any Proceeding (other than a proceeding against the other Party hereto) in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefor under Section 5 below).

(d) <u>Transition</u>.  As of the Closing, the parties will enter into the Transition Services Agreement in the form attached hereto as <u>Exhibit II</u>.  Seller will not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of the Business from maintaining the same business relationships with Buyer after the Closing as it maintained with Seller prior to the Closing.  Seller will refer all customer inquiries relating to the Business to Buyer from and after the Closing.

(e)    <u>Employee Matters.</u>

(i)    <u>Schedule 6(e)(i)</u> contains a list of each of the Business employees as of the date hereof. Buyer may, or may cause one of its Affiliates to, make offers of employment to certain Business employees, upon such terms and conditions as Buyer shall determine in its sole discretion. Business employees who accept such offer of employment, as of the effective date of their employment with Buyer or one of its Affiliates, shall be referred to as "<u>Transferred Employees.</u>" The foregoing shall not be construed to (a) require the Buyer or any of its Affiliates to make offers of employment to any Business employees or (b) limit the ability of Buyer or any of its Affiliates to terminate the employment of any employee (including any Transferred Employee) at any time and for any or no reason.

(ii)    If Buyer chooses to employ any of the Transferred Employees, as of the Closing Date, or at such other time that any of the Transferred Employees is employed by the Buyer, each of the Transferred Employees shall cease active participation in the Business Benefit Plans, except to the extent otherwise provided by the terms of any Business Benefit Plan or Applicable Law. Notwithstanding the foregoing, effective as of the Closing Date, or at such other time that any of the Transferred Employees is employed by the Buyer, if applicable, Seller shall take all actions as may be necessary to fully vest all Transferred Employees in their account balances under Seller's 401(k) plan, and shall make all employer matching and profit sharing contributions on behalf of all Transferred Employees irrespective of any end-of-year or other service requirements, in an amount pro-rated to the Closing Date.

(iii)    If Buyer chooses to employ any of the Transferred Employees, all continuous service of the Transferred Employees credited by Seller under an analogous Business Benefit Plan as of the Closing Date will apply towards establishing (i) waiting periods for participation in Buyer benefit plans or programs related to health, welfare and retirement, (ii) vacation eligibility and (iii) vesting under retirement plans. Notwithstanding the foregoing, (i) the date of entry of any Transferred Employee with respect to any Buyer benefit plan or program, will be based on the actual enrollment or effective date, and (ii) no such deemed service credit will be required to the extent it would result in a duplication of benefits. With respect to any "welfare benefit plan" (as defined in Section 3(1) of ERISA) offered to Transferred Employees (other than plans pertaining to long-term disability benefits), in the plan year in which the Closing occurs Buyer shall use commercially reasonable efforts to (i) cause to be waived any pre-existing condition limitation to the same extent such pre-existing condition was waived under a comparable Business Benefit Plan and (ii) provide that any expenses incurred by a Transferred Employee before the Closing Date under a similar Business Benefit Plan shall be taken into account for purposes of satisfying applicable deductible and maximum out-of-pocket limitations. Nothing herein shall limit the ability of Buyer to amend or terminate any Buyer benefit plans or programs in accordance with their terms and Applicable Law at any time. Seller will pay all accrued vacation and sick leave to any of the Transferred Employees as of the Closing Date.

(iv)    If Buyer chooses to employ any of the Transferred Employees, Buyer shall permit each Transferred Employee who has received an eligible rollover distribution (as defined in Section 402(c)(4) of the Code) from a Business Benefit Plan, if any, to roll such eligible rollover distribution (including any outstanding participant loans) as part of any lump sum distribution to the extent permitted under Applicable Law into an account under a comparable Employee Benefit Plan maintained by Buyer or an Affiliate of Buyer, solely to the extent such eligible rollover distribution (other than any participant loan promissory note) is in cash.

(v)    Nothing contained in this Agreement, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement, or arrangement of Buyer or any of its Affiliates; (ii) shall alter or limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any benefit plan, program, agreement or arrangement at any time assumed, established, sponsored or

maintained by any of them; (iii) is intended to confer upon any current or former employee or any other Person any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment; or (iv) is intended to confer upon any Person (including employees, retirees, or dependents or beneficiaries of employees or retirees) any rights as a third-party beneficiary of this Agreement.

(vi)     Seller agrees that for a period of two (2) years following the Closing Date, Seller and its Affiliates will not directly or indirectly, without the prior written approval of Buyer, solicit for hire or hire, any employee, or directly or indirectly, solicit for hire, or hire on behalf of any third party, any employee of Buyer or any of its Subsidiaries; provided, however, that nothing in this 6(e)(vi) shall be deemed breached by any general advertisement for potential employees that is not specifically directed at Buyer's or any of its Subsidiaries' employees.

(f) Confidentiality.  After the Closing, Seller will treat and hold all of the Confidential Information as confidential, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all extracts, summaries and copies) of the Confidential Information which are in its possession or control.  In the event that Seller is requested or required (by oral question or request for information or documents in any legal Proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 6(f).  If, in the absence of a protective order or the receipt of a waiver hereunder, Seller is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal, Seller may disclose the Confidential Information to the tribunal; provided, however, that Seller shall use its commercially reasonable efforts to obtain, at the reasonable request of Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

(g) Covenant Not to Compete.

(i)     It is recognized and understood by the Parties hereto that the Seller and its Affiliates have a considerable amount of knowledge and goodwill with respect to the Business, which knowledge and goodwill are extremely valuable and which would be extremely detrimental to the Buyer if used by the Seller or its Affiliates to compete with the Buyer after the Closing.  It is, therefore, understood and agreed by the Parties hereto that, as a material inducement to the Buyer to enter into this Agreement and consummate the transactions hereunder, the Seller covenants and agrees that for the period commencing with the Closing Date and ending three (3) years after the Closing, neither the Seller nor any Affiliate shall directly, indirectly or in concert with any other person or entity, as a stockholder, owner, partner, joint venturer, consultant or advisor, engage, manage, control, participate in, consult with or render services for any business selling, providing or supporting any web site design, shared web hosting, dedicated web hosting or domain name registration services; provided, however, that the Seller shall not be precluded from (A) registering domain names on Seller's own behalf, (B) hosting web sites owned and controlled by Seller, or (C) owning (as a passive investor) securities of corporations that are listed on a national securities exchange or traded in the national over-the-counter market in an amount that shall not exceed one percent (1%) of the outstanding shares of any such corporation.

(ii)     Because of the difficulty of measuring economic losses to the Buyer as a result of a breach of the foregoing covenants in this Section 6(g), and because of the immediate and irreparable damage that could be caused to the Buyer for which it would have no other adequate

remedy, the Seller agrees that the foregoing covenant may be enforced by the Buyer in the event of breach or threatened breach by the Seller, in addition to, but not in lieu of, any other available remedies, by injunctions and restraining orders and other equitable remedies.

(iii)     The Seller has carefully read and considered this Section and, having done so, agrees that the restrictions set forth in this Section are fair and reasonable and are reasonably required for the protection of the interests of the Buyer in light of the activities and business of the Buyer and its Affiliates on the date of the execution of this Agreement and the current plans of the Buyer and its Affiliates.

(iv)     The parties hereby agree that, if at the time of enforcement of this Section 6(g) a court shall hold that the duration or scope stated herein are unreasonable under the circumstances then existing, the maximum duration or scope under such circumstances shall be substituted and the court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope permitted by law.

(h) Option To Purchase Optional Tangible Personal Property.  The parties understand and agree that concurrent with the Closing, Seller grants to Buyer an option to purchase, for no additional compensation, the Optional Tangible Personal Property listed on Annex I attached hereto.  The parties understand and agree that (a) such option may be exercised on or before May 31, 2008, on 10 days written notice to Seller, and (b) if such option has not been exercised by May 31, 2008, that it shall automatically expire on that date.

7.    Miscellaneous.

(a) Press Releases and Public Announcements.  Except as is consistent with the form of press release attached hereto as Exhibit VI, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of the other Party; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its commercially reasonable efforts to advise the other Party prior to making the disclosure); *provided, further*, that in no event shall any such press release or public announcement disclose any of the terms or conditions of this Agreement.

(b) No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c) Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties related to the subject matter hereof, and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof including the Letter of Intent between the Parties dated April 25, 2007, and the Confidentiality Agreement between the Parties dated January 17, 2007

(d) Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations.

(e) Counterparts. This Agreement may be executed in one or more counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(f) Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g) Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) four (4) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

*If to Seller:*

Mr. Felix Rodriquez
TSV Group, Inc.
1 North Lexington Avenue, 5th Floor
White Plains, NY 10607

*If to Buyer:*

Abacus America, Inc. d/b/a Aplus.net
7500 West 110th Street, Suite #400
Overland Park, KS 66210
Attn: Gabe Murphy and
Ralph Munyan
Facsimile: (913) 890-7701
E-Mail: ralphm@aplus.net

*Copy to (which shall not constitute notice):*

Catalyst Investors II, L.P.
711 Fifth Avenue, Suite 402
New York, NY 10022
Attn: Tyler Newton
Facsimile: (212) 319-5771

Wade Kerrigan
Blackwell Sanders Peper Martin LLP
4801 Main, Suite 1000
Kansas City, MO 64112
Facsimile: (816) 983-8080

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

(h) Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(i) Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

(j) Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k) Expenses. Except as otherwise provided herein, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement shall be paid by Seller when due, and Seller will file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation; provided that the Buyer and Seller shall equally share all such costs and expense.

(l) Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Nothing in the Disclosure Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Disclosure Schedules identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(m) <u>Incorporation of Annexes, Exhibits and the Disclosure Schedules</u>.  The Annexes, Exhibits and the Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(n) <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any provision of this Agreement not performed in accordance with its specific terms or otherwise is breached, so that a Party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such Party may be entitled, at law or in equity. In particular, the Parties acknowledge that the Business is unique and recognize and affirm that in the event Seller breaches this Agreement, money damages would be inadequate and Buyer would have no adequate remedy at law, so that Buyer shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the other Parties' obligations hereunder not only by action for damages but also by action for specific performance, injunctive, and/or other equitable relief.

(o) <u>Submission to Jurisdiction</u>.  Each of the Parties submits to the jurisdiction of any state or federal court sitting in New York City, New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Any Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 7(g) above.  Nothing in this Section 7(o), however, shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.

* * * * *

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

BUYER:

ABACUS AMERICA, INC., D/B/A APLUS.NET

By: _____
Name:   Gabriel Murphy
Title:    CEO


SELLER:

TSV GROUP, INC.

By: _____
Name:   Felix Rodriguez
Title:    CEO

DISCLOSURE SCHEDULES RELATING TO THE

TSV GROUP, INC. – ABACUS AMERICA, INC. DBA APLUS.NET

ASSET PURCHASE AGREEMEMT

SCHEDULE 3(a): Organization of Seller

(i)      The statements contained in Section 3(a)(i) are true, correct, and complete as of the date hereof, without exception.

(ii)      The statements contained in Section 3(a)(ii) are true, correct, and complete as of the date hereof, without exception; TSV Group, Inc. is in sole control of the Business

SCHEDULE 3(b): Authorization of Transaction

The statements contained in Section 3(b) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(c): No Conflicts; No Bankruptcy

The statements contained in Section 3(c) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(d): Brokers' Fees

The statements contained in Section 3(d) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(e): Title to Assets; Sufficiency of Assets

(i) The statements contained in Section 3(e)(i) are true, correct, and complete as of the date hereof, without exception.

(ii) The statements contained in Section 3(e)(ii) are true, correct, and complete as of the date hereof, without exception, except the Buyer is only granted an option to purchase the Optional Tangible Personal Property.

<u>SCHEDULE 3(f): Financial Statements</u>

The statements contained in Section 3(f) are true, correct, and complete as of the date hereof, without exception.

<u>SCHEDULE 3(g): Events Subsequent to Most Recent Fiscal Year End</u>

    (i)

    (ii)

    (iii)

    (iv)

    (v)

    (vi)

    (vii)

    (viii)

    (ix)

    (x)

    (xi)

    (xii)

    (xiii)

    (xiv)

    (xv)

    (xvi)

    (xvii)

    (xviii)

    (xix)

    (xx)

    (xxi)

    (xxii)

The statements contained in Section 3(g)(i) through Section 3(g)(xxii) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(h): Undisclosed Liabilities

The statements contained in Section 3(h) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(i): Legal Compliance

(i)     The statements contained in Section 3(i)(i) are true, correct, and complete as of the date hereof, without exception.

(ii)     The statements contained in Section 3(i)(ii) are true, correct, and complete as of the date hereof, without exception.

<u>SCHEDULE 3(j): Tax Matters</u>

     (i)

     (ii)

     (iii)

     (iv)

     (v)

The statements contained in Section 3(j)(i) through Section 3(j)(v) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(k): Properties

(i)     The statements contained in Section 3(k)(i) are true, correct, and complete as of the date hereof, except that the Seller leases premises necessary for operation of the business at 1 North Lexington Ave., White Plains New York 10601.

(ii)

(iii)

(iv)

(v)

(vi)

(vii)

(viii)

The statements contained in Section 3(k)(ii) through Section 3(k)(viii) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(l): Intellectual Property

    (i)

    (ii)

    (iii)

The statements contained in Section 3(l)(i) through Section 3(l)(iii) are true, correct, and complete as of the date hereof, without exception.

    (iv)

        (A)

        (B)

        (C)

        (D)

        (E)

The statements contained in Section 3(l)(iv) are true, correct, and complete as of the date hereof, without exception. The statements contained in Section 3(l)(iv)(A) through Section 3(l)(iv)(E) are non-applicable to the transaction.

    (v)    Seller has subscription agreements with Getty Images, Inc., Shutterstock, Inc., and Jupiterimages (a.k.a. Comstock), and will provide all usernames and passwords required to transfer each subscription agreement account to Buyer at Closing. The statements contained in Section 3(l)(v) are true, correct, and complete as of the date hereof, without exception.

        (A)

        (B)

        (C)

        (D)

        (E)

        (F)

        (G)

    (vi)

    (vii)    The statements contained in Section 3(l)(v)(A) through Section 3(l)(v)(G), and Section 3(l)(vi) are true, correct, and complete as of the date hereof, without exception.

## SCHEDULE 3(m): Systems

(i)     The statements contained in Section 3(m)(i) are true, correct, and complete as of the date hereof, without exception.

(ii)     The statements contained in Section 3(m)(ii) are true, correct, and complete as of the date hereof, without exception.

(iii)     The statements contained in Section 3(m)(iii) are true, correct, and complete as of the date hereof, without exception.

(iv)     The statements contained in Section 3(m)(iv) are true, correct, and complete as of the date hereof, without exception.

<u>SCHEDULE 3(n): Data Security and Privacy</u>

The statements contained in Section 3(n) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(o): Contracts

The statements contained in Section 3(o) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(p): Labor Matters

The statements contained in Section 3(p) are true, correct, and complete as of the date hereof, without exception.

<u>SCHEDULE 3(q): Employee Benefit Plans</u>

(i)    The statements contained in Section 3(q)(i) are true, correct, and complete as of the date hereof, without exception.

(ii)

(iii)

(iv)

(v)

The statements contained in Section 3(q)(ii) through Section 3(q)(v) are non-applicable to the transaction.

SCHEDULE 3(r): Environmental Matters

The statements contained in Section 3(r) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(s): Powers of Attorney

The statements contained in Section 3(s) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(t): Insurance

The Acquired Assets are uninsured.

SCHEDULE 3(u): Litigation

The statements contained in Section 3(u) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(v): Certain Business Relationships With Seller

The statements contained in Section 3(v) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(w): Customers and Suppliers

(i)     The statements contained in Section 3(w)(i) are true, correct, and complete as of the date hereof, without exception.

(ii)     The statements contained in Section 3(w)(ii) are true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(x): Accounts Receivable

The statements contained in Section 3(x) arc true, correct, and complete as of the date hereof, without exception.

SCHEDULE 3(y): Disclosure

The statements contained in Section 3(y) are true, correct, and complete as of the date hereof, without exception.

# EXHIBIT B

## TRANSITION ASSISTANCE AGREEMENT

This **TRANSITION ASSISTANCE AGREEMENT** ("Agreement") is entered into this 1st day of August 2007 (the "Effective Date") by and between TSV Group, Inc., a Delaware corporation, on behalf of itself, and its operating subsidiaries and Affiliates, (together with such subsidiaries and Affiliates, "TSV") and **Abacus America, Inc. d/b/a Aplus.Net,** a California corporation, on behalf of itself and its operating subsidiaries and controlled affiliates (together with such subsidiaries and affiliates hereinafter referred to as "APlus"), whose principal place of business is located at 7500 W. 110th Street, Suite 400, Overland Park, KS 66210. The parties hereto may individually be referred to herein as a "Party" and collectively as the "Parties."

**WHEREAS,** TSV and APlus have entered into an Asset Purchase Agreement ("APA") **dated as of August 1, 2007,** for the acquisition by and transfer to APlus of certain assets previously owned by TSV in connection with its WebImage business (the "Business") assume certain liabilities of TSV related to the Business;

**WHEREAS,** APlus desires to engage TSV to continue to perform certain services related to the operation of the Business by APlus after the date hereof and provide certain deliverables as will be specified hereunder and requested by APlus from time to time;

**WHEREAS,** TSV is willing to be so engaged by APlus on the terms specified in this Agreement; and

**WHEREAS,** the Parties desire to set forth in writing the terms and conditions of their agreements and understandings.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual promises herein contained, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending legally to be bound, hereby agree as follows:

### ARTICLE I. DEFINITIONS.

Capitalized terms and phrases used in this Agreement will have the meanings set forth in <u>Exhibit 1</u> attached hereto or as otherwise defined throughout the terms herein. Terms that are not so defined will be deemed defined in the context in which they are used.

### ARTICLE II. SERVICES

**A.** As described in one or more applicable Addenda/Statements of Work/Task Orders (each a "SOW" and, collectively, the "SOWs") executed by the Parties and appended hereto, TSV will provide to APlus certain transition assistance in connection with the Business, including without limitation, consulting and other project services and certain reports, data, software, supplies and/or other items specifically stated in an applicable SOW. TSV will render such transition assistance and deliverables pursuant to the terms and conditions set forth herein and contained in each SOW, which, upon acceptance by APlus, will be subject to the terms and conditions of this Agreement.

### ARTICLE III. FEES AND PAYMENT TERMS.

**A.** **Fees and Expenses.** Excluding any additional fees that are specifically included in an applicable SOW ("Additional Fees"), APlus will pay a monthly fee of $25,000.00 in the aggregate, payable monthly in arrears, for all Transition Assistance agreed upon and set forth in the SOWs.

**B.** **Payment.** Unless otherwise provided for in such SOW, with respect to any Additional Fees, TSV will render invoices to APlus on a monthly basis. Payment with respect to such invoices will be due and payable upon receipt of invoice and shall be paid within 30 days of receipt of such invoice.

C.    **Taxes.**  All charges will be calculated exclusive of any applicable federal, state or local use, excise, value-added, gross receipts, sales and privilege taxes, duties, universal service assessments or similar liabilities associated with the Transition Assistance and Deliverables, whether charged to APlus, its suppliers or Affiliates, TSV or an End User.  This Section will not apply to taxes based on TSV income or payroll taxes, any state business franchise or occupation taxes, or any goods or services provided for customers other than APlus that are not covered by this Agreement.

## ARTICLE IV.  TERM & TERMINATION.

A.    **Term.**  This Agreement will commence on the Effective Date and will continue until the earlier of: (i) one (1) year or (ii) the date on which the term of the last effective SOW expires or is otherwise terminated (in either case, the "Term"), unless otherwise earlier terminated in accordance with this Agreement.

B.    **Event of Default Termination.**  In the event that either Party commits an Event of Default, the other Party may, by giving written notice to the defaulting Party and a ten (10) day opportunity to cure, terminate the applicable SOW or the entire Agreement at the election of the terminating Party. The foregoing notwithstanding, the non-defaulting Party may also pursue any legal remedies it may have under applicable law or principles of equity relating to such breach and subject to the terms of this Agreement.

C.    **Termination for Convenience.**  APlus may also terminate this Agreement, any SOW, or any Transition Assistance component of a SOW, for any reason upon thirty (30) days' written notice to TSV.

D.    **Effect of Termination.**  Termination of an SOW or this Agreement will result in the termination of the Parties' respective commitments and obligations under a terminated SOW or this Agreement, as applicable, from and after the date of termination but will not relieve the Parties of their payment or other obligations incurred prior to the date of termination.  To the extent TSV is performing Transition Assistance at the time of termination, TSV will, with regard to such Transition Assistance: (i) inform APlus of the extent to which performance has been completed through the date of termination or expiration; and (ii) invoice APlus for all prorated amounts properly due and owing since the date of the last invoice.

## ARTICLE V. REPRESENTATIONS.

A.    **TSV Representations.**  TSV covenants, represents and warrants that, during the Term, it will provide the Transition Assistance under this Agreement in a professional and workmanlike manner in compliance with all laws, regulations, orders and decrees applicable to TSV and its business and at a performance level at least equal to that which TSV provides for its own business requirements.

B.    **APlus Representations.**  APlus represents and warrants, as of the Effective Date and from time to time throughout the term of this Agreement with respect to the provision of Transition Assistance hereunder, that APlus' use of the Transition Assistance shall, at all times, be in compliance with all laws, regulations, orders and decrees applicable to APlus in its business and in the acceptance of the Transition Assistance hereunder.

## ARTICLE VI.  INTELLECTUAL PROPERTY.

**A.    Reservation.** Each Party retains all right, title and interest in and to its respective Intellectual Property rights as may be more fully described below.  No licenses will be deemed to have been granted by either Party to any of its Intellectual Property rights, except as otherwise expressly authorized in a SOW.  The Parties will not reverse engineer or otherwise attempt to derive source code from any materials of the other Party.

**B.    Ownership of Materials and Tools.**

**1.    APlus Material.** All right, title and ownership to any tools, software (both in object code and source code form), hardware, data, databases, architecture, diagrams, other materials and know-how, which APlus developed prior to the Agreement or which APlus independently develops or licenses from a third party at any time (together with the "APlus Materials" as defined in Exhibit 1 to this Agreement) will remain the exclusive property of APlus (or its licensor) and will further be deemed Confidential Information of APlus. Absent express consent or pre-existing circumstances (e.g., as specified in a SOW), APlus Materials will not be co-mingled with materials or data of any other of TSV's customers or users. APlus hereby grants to TSV (including its agents, consultants and subcontractors) the limited right to use APlus Materials only in connection with TSV's performance of Transition Assistance.

**2.    TSV Materials.** Unless otherwise provided in any SOW, all right, title and ownership of all TSV Materials used by TSV in the provision of Transition Assistance will remain the exclusive property of TSV or its suppliers and licensors. In performing hereunder, TSV may use commercially available Third Party Elements which are subject to copyright, patent or other license rights granted to TSV. No right, title, express or implied license, sublicense, right of resale, warranty or other rights in such Third Party Elements is granted from TSV to APlus by virtue of this Agreement or otherwise.

## ARTICLE VII.  CONFIDENTIALITY.

Each Party shall preserve the other Party's Confidential Information provided to it hereunder with the same degree of care in protecting its own confidential or proprietary information, but in no event less than a reasonable standard of care shall be used and shall execute and comply with the terms, conditions and obligations of the Confidentiality Agreement dated January 17, 2007 (the "Confidentiality Agreement") by and between TSV and APlus.

## ARTICLE VIII.  PERSONAL DATA.

**A.    Ownership and Use of APlus Personal Data.** All APlus Personal Data is and will remain the property and responsibility of APlus.  TSV will access, use, collect, maintain, and disclose or share APlus Personal Data only to the extent strictly necessary to perform its obligations under this Agreement, or as otherwise required by law. Except to the extent that TSV Personal Data and APlus Personal Data may be the same or duplicated by virtue of the previous ownership of certain assets by TSV, in connection with the Transition Assistance hereunder TSV will not modify, merge, or co-mingle any APlus Personal Data with any other data, and will not commercially exploit APlus Personal Data, disclose or do any other thing that may in any manner adversely affect the integrity, security or confidentiality of such data, other than as expressly directed by APlus. TSV, its employees and agents will have no liability to APlus resulting from TSV's proper access to, handling or use of APlus Personal Data in compliance with this Agreement.

**B.    Ownership and Access to TSV Personal Data.** All TSV Personal Data is and will remain the property of TSV.  To the extent APlus may have access to any TSV systems or data which contain TSV Personal Data or information from which TSV Personal Data may be derived, APlus will not access, use, collect, maintain, disclose or share any TSV Personal Data for any reason.  Further, APlus may not modify, merge or co-mingle any TSV Personal Data with any other data, and will not commercially exploit it, disclose it or do any other thing that may in any manner adversely affect the integrity, security or confidentiality of such data.

C.    **Disclosure of Personal Data.**  Except in response to a valid court order or otherwise to the extent legally required in response to a request from a law enforcement agency, in no event will either Party disclose any Personal Data of the other to any Third Party.  In the event a Party is legally required to disclose any Personal Data of the other pursuant to a valid governmental or law enforcement request, it will promptly notify the other (if legally permissible) to permit the Party whose Personal Data is being sought to seek a protective order or to take other appropriate action to prevent or limit such disclosure.  The Parties agree to cooperate with one another in efforts to obtain a protective order or other reasonable assurance that confidential treatment will be afforded the Personal Data in question.  If production is compelled as a matter of law in the absence of a protective order, the disclosing Party will limit disclosure to only that part of the Personal Data that is required by law to be disclosed, and will use its commercially reasonable efforts to obtain confidential treatment therefore.

D.    **Cooperation and Inspection.**  Each Party represents that it has, or will establish, data security policies and disciplinary processes to address any unauthorized access, use or disclosure of the Personal Data of the other by its employees, agents or Subcontractors. Each Party agrees that it will promptly notify the other of any breaches of security that may result in the unauthorized access, use or disclosure of the Personal Data of the other, and make all reasonable efforts to assist the other in relation to the investigation and remedy of any such breach of security and any claim, allegation, action, suit, proceeding or litigation with respect to the unauthorized access, use or disclosure of the affected Party's Personal Data.

E.    **Confidentiality.**  The obligations set forth in this Article VIII supplement, and will govern to the limited extent there is a conflict between this Article and the Confidentiality Agreement.

## ARTICLE IX. INDEMNIFICATION.

A.    **Indemnity Obligations.**  TSV will defend, indemnify and hold harmless APlus, its Affiliates, officers, directors, employees, and shareholders from and against any Claims or Losses arising out of, relating to, incurred in connection with, or based upon (a) any breach by TSV of its obligations, warranties and representations set forth in this Agreement or any SOW hereunder or (b) any breach of the provisions respecting the APlus Personal Data, except where such Claims or Losses are the result of the gross negligence or willful misconduct of APlus.  APlus will defend, indemnify and hold harmless TSV, its Affiliates, officers, directors, employees, and shareholders from and against any Claims or Losses arising out of, relating to, incurred in connection with, or based upon: (a) any misuse of the Transition Assistance; (b) any breach by APlus of its obligations, warranties and representations set forth in this Agreement or any SOW hereunder; or (c) any breach of the provisions respecting the TSV Personal Data, except where such Claims or Losses are the result of the gross negligence or willful misconduct of TSV.

B.    **Procedure.**  If a third party makes a Claim against a Party which is subject to indemnification hereunder, the Party in receipt of such Claim ("Indemnified Party") will promptly notify the other Party ("Indemnifying Party") in writing no later than thirty (30) days after receipt of such notification of a potential claim. The Indemnifying Party may assume sole control of the defense of such claim and all related settlement negotiations.  The Indemnified Party will provide the assistance, information and authority necessary to assist the Indemnifying Party in its obligations under this Section.  Neither Party may settle any such matter without the consent of the other as to any settlement that imposes an obligation on, or requires any admission by, the Indemnified Party.   Failure of the Indemnified Party to promptly notify the other will not relieve the Indemnifying Party of its obligations hereunder except to the limited extent such delay prejudices the Indemnifying Party.

## ARTICLE X.  LIABILITY AND LIMITATIONS OF LIABILITY.

A.    **Mutual Liability.**  Subject to the specific provisions of this Article, it is the intent of the Parties that each will be liable to the other only for any direct damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by the Agreement.

**B.**     **Limitations.**  EXCEPT AS OTHERWISE PROVIDED IN THE AGREEMENT, IN NO EVENT WILL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR OTHER INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF BUSINESS, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES WILL BE THE EXCLUSIVE REMEDY OF THE PARTIES AND THE SOLE LIABILITY OF EACH. OTHERWISE, EACH PARTY'S LIABILITY HEREUNDER WILL BE LIMITED TO ACTUAL DIRECT DAMAGES. THE FOREGOING LIMITATION WILL NOT APPLY WITH RESPECT TO THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION OR ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

**C.**     **Force Majeure.** Neither Party will be liable for any loss or damage resulting from any cause beyond its reasonable control (a "Force Majeure Event") including an "act of God", insurrection or civil disorder, war or military operations, national or local emergency, acts or omissions of government or other competent authority, compliance with any statutory obligation or executive order not otherwise applicable to the Parties in the ordinary course of business, fire, lightning, explosion, flood, subsidence, weather of exceptional severity, or any similar act or omission beyond the reasonable control of any Party. Upon the occurrence of a Force Majeure Event and to the extent such occurrence interferes with a Party's performance of this Agreement, each Party will be excused from performance of its obligations during the period of such interference, provided that each Party uses all commercially reasonable efforts to avoid or remove such causes of nonperformance.

## ARTICLE XI. GENERAL.

**A.**     **Assignment.**  Neither Party may assign this Agreement or delegate its obligations hereunder, in whole or in part, without the prior written consent of the other Party.

**B.**     **Notices.**  Any notices, requests, demands, and determinations under this Agreement (other than routine operational communications) must be provided in writing with copies sent to the legal representative of the receiving Party. Each such communication must be provided by verifiable means either upon receipt via express, overnight or certified courier or mail with a reliable system for tracking delivery, delivery costs paid, and sent to the address listed on the first page of this Agreement. A Party may from time to time change its address or designee for notice purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

**C.**     **Relationship of Parties.**  For purposes of the Transition Assistance: (i) The Parties are and shall be independent contractors, bound to each other only as provided for herein; (ii) neither Party shall have the authority to bind, act on behalf of or represent the other; (iii) nothing in this Agreement shall be interpreted to create a relationship of partnership, employer and employee, principal and agent, master and servant, or franchisor and franchisee; and (iv) neither Party will act or fail to act in a way that could reasonably cause others to believe that it has authority to act on behalf of the other beyond the authority expressly granted herein.

**D.**     **Severability and Modification.**  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision will be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of this Agreement will remain in full force and effect. If any state or federal body of competent jurisdiction determines that any provision of this Agreement violates any applicable rules, policies, or regulations, both Parties will make reasonable efforts to promptly bring this Agreement into compliance and to the maximum extent possible will endeavor in those efforts to preserve for both Parties the economic benefits as reflected in this Agreement.

**E.    Consents and Approval.** Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under this Agreement, such action will not be unreasonably delayed, conditioned or withheld. An approval or consent given by a Party under this Agreement will not relieve the other Party from responsibility for complying with the requirements of this Agreement, nor will it be construed as a waiver of any rights under this Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

**F.    Waiver of Default.** No waiver or discharge hereof will be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under this Agreement will not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof will not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

**G.    Survival.** Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration (in whole or in part) will survive any such termination or expiration (in whole or in part, as applicable) and continue in full force and effect.

**H.    Governing Law.** This Agreement and performance hereunder will be governed by and construed in accordance with the laws of the State of New York without regard to its choice of law principles. The Parties hereby expressly opt-out from the applicability of any state's version of the Uniform Computer Information Transactions Act ("UCITA").

**L.    Order of Precedence.** Any conflict among or between the terms and conditions of the documents making up this Agreement will be resolved in accordance with the following order of precedence (in descending order of precedence): (i) this Agreement; (ii) the SOW(s); and (iii) any additional documentation (e.g., invoices, etc).

**N.    Mutual Representations.** Each Party represents that it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereunder, and the execution, delivery and performance of this Agreement have been duly authorized.

**O.    Entire Agreement.** Except for the Confidentiality Agreement referenced herein, this Agreement and the related SOWs hereunder constitute the entire agreement between the Parties with respect only to the subject matter in this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained therein. This Agreement may be modified only by a written instrument executed by both Parties.

**P.    Injunctive Relief.** Each Party acknowledges and agrees that a breach of any obligation set forth in this Agreement may result in irreparable harm for which monetary damages may not provide a sufficient remedy and, as a result, each Party may be entitled to both monetary damages and equitable relief.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| TSV GROUP, INC. | ABACUS AMERICA, INC. D/B/A APLUS.NET |
|---|---|
| By _____ | By _____ |
| Printed Name Gabriel Murphy | Printed Name Felix Rodriguez |
| Title CEO | Title CEO |
| Date 08/17/07 | Date 8-1-2007 |

**E.    Consents and Approval.** Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under this Agreement, such action will not be unreasonably delayed, conditioned or withheld.  An approval or consent given by a Party under this Agreement will not relieve the other Party from responsibility for complying with the requirements of this Agreement, nor will it be construed as a waiver of any rights under this Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

**F.    Waiver of Default.** No waiver or discharge hereof will be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced.  A delay or omission by either Party hereto to exercise any right or power under this Agreement will not be construed to be a waiver thereof.  A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof will not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

**G.    Survival.** Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration (in whole or in part) will survive any such termination or expiration (in whole or in part, as applicable) and continue in full force and effect.

**H.    Governing Law.** This Agreement and performance hereunder will be governed by and construed in accordance with the law of the State of New York without regard to its choice of law principles.  The Parties hereby expressly opt-out from the applicability of any state's version of the Uniform Computer Information Transactions Act ("UCITA").

**L.    Order of Precedence.** Any conflict among or between the terms and conditions of the documents making up this Agreement will be resolved in accordance with the following order of precedence (in descending order of precedence): (i) this Agreement; (ii) the SOW(s); and (iii) any additional documentation (e.g., invoices, etc).

**N.    Mutual Representations.** Each Party represents that it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereunder, and the execution, delivery and performance of this Agreement have been duly authorized.

**O.    Entire Agreement.** Except for the Confidentiality Agreement referenced herein, this Agreement and the related SOWs hereunder constitute the entire agreement between the Parties with respect only to the subject matter in this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained therein.  This Agreement may be modified only by a written instrument executed by both Parties.

**P.    Injunctive Relief.** Each Party acknowledges and agrees that a breach of any obligation set forth in this Agreement may result in irreparable harm for which monetary damages may not provide a sufficient remedy and, as a result, each Party may be entitled to both monetary damages and equitable relief.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| TSV GROUP, INC. | ABACUS AMERICA, INC. D/B/A APLUS.NET |
|---|---|
| By _____ | By _____ |
| Printed Name Felix Rodiguez | Printed Name Gabriel Murphy |
| Title CEO _____ | Title CEO _____ |
| Date 8-17-7 _____ | Date 08/17/07 _____ |

KC-1508270-3

**Exhibit 1**

**Transition Assistance Agreement**

Pursuant to Article I of the Transition Assistance Agreement ("Agreement"), the following capitalized terms and phrases used in the Agreement will have the meanings set forth herein. Terms that are not so defined will be deemed defined in the context in which they are used.

A.  "**Affiliate**" means, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

B.  "**Agreement**" means this Agreement, and all Addenda, Exhibits, Schedules or SOWs made hereunder.

C.  "**APlus Customer/End User**" means, without limitation, any APlus customers and users of any of APlus systems or service offerings.  End Users and Confidential Information belonging to APlus Customers and End Users to which TSV may have access shall be treated by TSV as Confidential and/or as APlus Personal Data hereunder.

D.  "**APlus Materials**" means APlus business, marketing, financial or other data; APlus content; APlus software, equipment, information, intellectual property and other personal property (both tangible and intangible); and all data about any specific APlus End User, which information is not generally available to the public and which TSV acquires or derives in carrying out its obligations under this Agreement, which may be run, used or provided to TSV in connection with the Transition Assistance or Deliverables or the use thereof, including, but not limited to, all of APlus Personal Data maintained in TSV database servers.  APlus Materials will, in all cases, be treated as Confidential Information of APlus.

E.  "**APlus Personal Data**" means any personally identifying information, or any other information that, either individually or when combined with other information, could be used to derive information specific to a particular APlus employee or APlus Customer/End User, which information is not generally available to the public and which TSV acquires or derives in carrying out its obligations under this Agreement.  APlus Personal Data includes, but is not limited to, information regarding APlus employee's or APlus Customer/End User's identity, social security, employee or other identification number, payroll account number, credit card number, e-mail address, customer account information, purchase and usage information, and other Personally Identifiable Information as such term may be defined under Privacy Laws.

F.  "**Claims**" means any actual or threatened losses, liability, claims, damages, penalties, costs, fees or expenses (including without limitation attorneys' fees and costs) arising from or incurred in connection with any action, proceeding or claims made or brought by a third party.

G.  "**Confidential Information**" has the meaning ascribed to such term in the Confidentiality Agreement; provided that such meaning shall be expanded to include the terms and conditions of this Agreement.

H.  "**Control**" and its derivatives means legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity (provided, however, that the Transition Assistance to be provided by TSV to APlus under this Agreement do not constitute "Control" of APlus by TSV).

I.  "**Days**" means calendar days unless otherwise specified.

J.  "**Deliverables**" means the final work product or other material, regardless of form, that TSV is required to deliver to APlus in accordance with a SOW.

K.  "**End User**" means APlus or the Person that ultimately uses the Transition Assistance provided by TSV. End Users and Confidential Information belonging to End Users which TSV may have access to shall be treated by TSV as Confidential and Personal Data hereunder.

L.  "**Events of Default**" means any of the following:

(i)  any representation or warranty made by a Party in this Agreement which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of its bargain;

(ii) a material breach of this Agreement that is not cured within thirty (30) days after notice of breach to the breaching Party; or

(iii) Failure to make any payment when such payment or amount is due and such failure continues for thirty (30) days after receipt of written notice of such failure.

M. **"Fixed Price Basis"** means a compensation arrangement in which TSV assumes responsibility for the performance of professional services and/or delivery of any Deliverables set forth in a SOW for a fixed price.

N. **"Intellectual Property"** means all statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights established under U.S. law.

O. **"Losses"** means any liabilities, damages and related costs and expenses, including fines, levies, assessments, and reasonable legal fees, allocable costs of in-house counsel, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

P. **"Person"** means any individual, corporation, proprietorship, firm, partnership, limited liability company, trust, association or any other entity.

Q. **"Third Party"** means any party that is neither a Party to this Agreement nor an Affiliate of a Party.

R. **"Third Party Elements"** means, collectively, all software, open source code, tools, methodologies, processes, techniques, algorithms, ideas, know-how, documentation, technical information, technology, material and other items whose Intellectual Property rights belong to Third Parties and that are used by TSV in the course of performing Transition Assistance or otherwise implementing this Agreement, including, without limitation, those Third Party Elements that are incorporated into TSV Materials, the Transition Assistance or Deliverables.

S. **"Transition Assistance"** means services set forth in any SOW executed by the Parties and appended to this Agreement, including consulting and other project services, access to reports, data, software, supplies and/or other items and Third Party Elements.

T. **TSV Customer/End User"** means, without limitation, any TSV customers and/or users of any TSV systems or service offerings. End Users and Confidential Information belonging to TSV Customers and End Users which APlus may be exposed to, acquire or derive through its access to and/or use of the Transition Assistance and any TSV Materials shall be treated by APlus as Confidential and/or TSV Personal Data hereunder.

U. **"TSV Materials"** means TSV-owned or TSV-provided materials, information, services, software, data, tools, utilities, methods, hardware, documentation or other pre-existing proprietary material, including any Third Party Elements used by TSV in or the provision of Transition Assistance.

V. **"TSV Personal Data"** means any personally identifying information, or any other information that, either individually or when combined with other information, could be used to derive information specific to a particular TSV employee or TSV Customer/End User, which information is not generally available to the public and which APlus is exposed to, acquires or derives through its access to and/or use of any TSV Materials. TSV Personal Data includes, but is not limited to, information regarding an TSV employee's or TSV Customer/End User's identity, social security, employee or other identification number, payroll account number, credit card number, e-mail address, customer account information, purchase and usage information, and other Personally Identifiable Information as such term may be defined under Privacy Laws.

W. **"TSV Personnel"** means all TSV employees, representatives, agents and subcontractors who perform work under this Agreement.

**\*\*this space intentionally left blank\*\***

**Transition Services Agreement**
**Statement of Work for Services and Assistance**

This Statement of Work ("SOW") is entered into between TSV Group, Inc. on behalf of itself, its operating subsidiaries and affiliates, with a principal place of business at 1 North Lexington Avenue, White Plains, N.Y. 10601 ("TSV") and Abacus America, Inc. d/b/a Aplus.net with its principal place of business at 7500 W. 110th Street, Suite 400, Overland Park, KS 66210 (the "Buyer"). Reference is made to the Transition Services Agreement between TSV and the Buyer dated August 1, 2007 ("the TSA"), which this SOW is subject to and made a part of. The parties may individually be referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the TSA.

1.    **Definition of Project**

TSV will provide Services and consulting support, management, oversight, advice and assistance ("Assistance") to the Buyer to assist Buyer in the transition of existing business functions ("Business Operations"). TSV will also provide Buyer with access to or use of certain TSV systems ("Access") to support the tasks and responsibilities provided by this SOW. Collectively, Assistance and Access may be referred to as "Services."

2.    **Term**

The Term of this SOW (the "Term") will commence on the Effective Date of the TSA and will continue until the earlier of: (1) the term of months specified for any particular Service element, but in no event longer than May 31, 2008; or (2) the date on which the Buyer provides written notice to TSV that the Buyer requires no further Services under this SOW.

3.    **Scope**

During the term of this SOW, TSV will provide Services as more fully described below and as necessary and appropriate to the Buyer. Services may also include the transition of TSV (now Buyer) customers' services and information while TSV maintains hosting service functionality, facilities and support services. The Buyer may choose to use some or all of the following Services. During the Term, TSV will provide:

A.    **Facilities:** (a) Access to and quiet use and enjoyment of that office space and (b) exclusive use of that computer equipment, furniture and office equipment contained therein as located at 1 North Lexington Avenue, White Plains, N.Y. 10601 as crosshatched and as attached hereto as Exhibit A and Exhibit B (the "Facilities Access").

The Term of Facilities Access shall not extend beyond May 31, 2008.

B.    **Revenue Collection:** TSV shall continue to bill, collect and book revenue from customers in accordance with past practices (via credit card payments, wire transfer or other means of payment) from both existing customers as of the Closing and customers acquired after the Closing (the "Revenue Collection"). Within three (3) business days of receipt of funds, TSV shall wire transfer such funds to the bank account as designated by Buyer along with an accounting of any such funds.

The Term of Revenue Collection shall be no more than (3) months.

C.    **Data Export:**  Within five (5) days request of Buyer, TSV shall export all customer data (including payment history, support emails, personal information, payment information including credit card information, etc.) into CSV format or some other format as specified by Buyer (the "Data Export").  Buyer can request a Data Export no more than five (5) times and cannot get a Data Export after three (3) months of the Closing.

D.    **Management Oversight:** TSV will continue to manage, oversee and ensure the Business and its personnel is run in a manner consistent with past practices (unless instructed otherwise by Buyer).

The Term of Management Oversight shall be the lesser of three (3) months or until Buyer has implemented its own billing process.

E.    **Sales & Customer Care:**  TSV will continue to sell new customers and support existing customers in a manner consistent with past practices (unless instructed otherwise by Buyer).  TSV shall continue to provide web maintenance services to customers in a timely fashion.

The Term of Sales & Customer Care shall be the lesser of three (3) months or until Buyer has implemented its own billing process.

F.    **Communication Services:**  Support for telephony (local and long distance services) service as well as Internet access consistent with amounts used by the Business historically.   Buyer will not transition additional call load from its customers existing prior to the date hereof or any new customers that are not obtained by the Buyer through the business purchased under the APA or through the Services.

The Term of Communication Services shall be the lesser of six (6) months or until Buyer implements its own IVR and ACD solution.

**4.    Additional Fees and Expenses:**

The following shall be considered Additional Fees and paid by the Buyer pursuant to Section III.B of the TSA:

A.    Buyer shall pay Base Monthly Fee of $25,000.00, payable in accordance with Article III of the TSA.  For any consulting style services which are expressly set forth as Additional Fees hereunder, Buyer shall pay on a time and materials basis at a rate of $100.00 per TSV employee hour.

B.    All reasonable out-of-pocket expenses of TSV related to providing the Services, each of which shall be approved in writing in advance by the Buyer.

C.    For purposes of clarity, unless otherwise provided herein or in writing signed by the Parties, Buyer will not be responsible for TSV's internal IT and resource costs to effectuate the Services.

**5.    TSV Assumptions:**

1.    TSV acknowledges that it's entering into this SOW and the TSA has been a material inducement to the Buyer's entering into the APA and consummating the transactions contemplated thereby.

2.      TSV will, in accordance with the TSA and this SOW, maintain and support the TSV systems and applications which contain data, information and functionality necessary for the Buyer to (i) transition such systems modifications, maintenance and support, (ii) operate its business, and (iii) transition away from its use of the Services.

3.      TSV will provide the Services to the Buyer at a priority level commensurate to or greater than that which TSV provides the same with respect to its own systems and shall allocate employees of the highest caliber of knowledge and skill sets with respect to the provision of such Services including employees of TSV who have supported WebImage in such Services in the past.

6.     **Identification of Representatives.**

A.      The initial TSV representative for the provision of Services and Assistance described in this Schedule is Felix Rodriguez

B.      The initial Buyer representative for receiving the Services and Assistance described in this Schedule is Shawn Hashmi

C.      The Parties' representatives will have primary responsibility for managing the relationship between the Parties with respect to the Services described in this Schedule, including attempts to resolve disagreements between the Parties.

D.      The Parties' representatives will meet from time to time, but no less than monthly unless otherwise agreed.  During these meetings, the TSV representative shall report on the status of Services being provided under this Schedule and respond to concerns raised by the Buyer.  Additionally, during these meetings, the Buyer representative shall report on the status of the Buyer's efforts to develop its IT Capabilities and/or secure services from Third Parties to provide the Services and Assistance to the Buyer for its own benefit and to reduce its dependency on XO

E.      Each Party's representative may be changed at any time upon written notice to the other Party.

**IN WITNESS HEREOF**, each of the parties have caused this Statement of Work to be executed by an authorized representative as of the date shown above:

**TSV Group, Inc.**

By: _____

Name:  Felix Rodriguez

Title:   CEO

**Buyer:**

By: _____

Name:  Gabriel Murphy

Title:   CEO

EXHIBIT A

Office Space

<u>EXHIBIT B</u>

Computer Equipment, Furniture and Office Equipment

A.    **Sales Team/ST**

   Computer = 16 (Tags ST 100 – ST 115)
   Desk = 16
   Chair = 16
   Telephone = 16
   Shredder = 1 (Tag 116)
   White Board = 1 (Tag 117)

B.    **Designers/DS**

   Computer = 2 (Tags DS 200 – 201)
   Desk = 2
   Chair = 2
   Telephone = 1 (Tag DS 201)
   White Board = 2 (Tags DS 202 – 203)

C.    **Project Managers/PM**

   Computer = 6 (Tags PM 300 – 305)
   Desk = 6
   Chair = 6
   Telephone = 7
   Small File Cabinet (black) = 1 (Tag PM 306)
   Copier = 1 (Tag PM 308)
   Printer = 1 (Tag PM 309)
   Scanner = 1 (Tag PM 310)
   Large File Cabinet (beige) = 3 (Tag PM 311 – 313)
   White Board = 4 (Tag PM 314 – 317)

D.    **Engineers/EN**

   Computer = 4 (Tags EN 400 – 401)
   Desk = 4
   Chair = 4
   Telephone = 1 (Tag EN 400)
   White Board = 2 (Tag EN 402 – 403)

E.    **Billing/AR**

1

Computer = 1 (Tag AR 500)
Desk = 1
Chair = 1
Telephone = 1
File Cabinet = 8 (7 black & 1 gray) (Tags AR 502 – 509)
Franking Machine = 1 (Pitney Bowes) (Tag AR 501)

# EXHIBIT C

**Transition Services Agreement**
**Statement of Work for Services and Assistance**

This Statement of Work ("SOW") is entered into between TSV Group, Inc. on behalf of itself, its operating subsidiaries and affiliates, with a principal place of business at 1 North Lexington Avenue, White Plains, N.Y. 10601 ("TSV") and Abacus America, Inc. d/b/a Aplus.net with its principal place of business at 7500 W. 110th Street, Suite 400, Overland Park, KS 66210 (the "Buyer"). Reference is made to the Transition Services Agreement between TSV and the Buyer dated August 1, 2007 ("the TSA"), which this SOW is subject to and made a part of. The parties may individually be referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the TSA.

**1.     Definition of Project**

TSV will provide Services and consulting support, management, oversight, advice and assistance ("Assistance") to the Buyer to assist Buyer in the transition of existing business functions ("Business Operations"). TSV will also provide Buyer with access to or use of certain TSV systems ("Access") to support the tasks and responsibilities provided by this SOW. Collectively, Assistance and Access may be referred to as "Services."

**2.     Term**

The Term of this SOW (the "Term") will commence on the Effective Date of the TSA and will continue until the earlier of: (1) the term of months specified for any particular Service element, but in no event longer than May 31, 2008; or (2) the date on which the Buyer provides written notice to TSV that the Buyer requires no further Services under this SOW.

**3.     Scope**

During the term of this SOW, TSV will provide Services as more fully described below and as necessary and appropriate to the Buyer. Services may also include the transition of TSV (now Buyer) customers' services and information while TSV maintains hosting service functionality, facilities and support services. The Buyer may choose to use some or all of the following Services. During the Term, TSV will provide:

      **A.     Facilities:** (a) Access to and quiet use and enjoyment of that office space and (b) exclusive use of that computer equipment, furniture and office equipment contained therein as located at 1 North Lexington Avenue, White Plains, N.Y. 10601 as crosshatched and as attached hereto as Exhibit A and Exhibit B (the "Facilities Access").

      The Term of Facilities Access shall not extend beyond May 31, 2008.

      **B.     Revenue Collection:** TSV shall continue to bill, collect and book revenue from customers in accordance with past practices (via credit card payments, wire transfer or other means of payment) from both existing customers as of the Closing and customers acquired after the Closing (the "Revenue Collection"). Within three (3) business days of receipt of funds, TSV shall wire transfer such funds to the bank account as designated by Buyer along with an accounting of any such funds.

      The Term of Revenue Collection shall be no more than (3) months.

C.    **Data Export:**  Within five (5) days request of Buyer, TSV shall export all customer data (including payment history, support emails, personal information, payment information including credit card information, etc.) into CSV format or some other format as specified by Buyer (the "Data Export").  Buyer can request a Data Export no more than five (5) times and cannot get a Data Export after three (3) months of the Closing.

D.    **Management Oversight:** TSV will continue to manage, oversee and ensure the Business and its personnel is run in a manner consistent with past practices (unless instructed otherwise by Buyer).

The Term of Management Oversight shall be the lesser of three (3) months or until Buyer has implemented its own billing process.

E.    **Sales & Customer Care:**  TSV will continue to sell new customers and support existing customers in a manner consistent with past practices (unless instructed otherwise by Buyer).  TSV shall continue to provide web maintenance services to customers in a timely fashion.

The Term of Sales & Customer Care shall be the lesser of three (3) months or until Buyer has implemented its own billing process.

F.    **Communication Services:**  Support for telephony (local and long distance services) service as well as Internet access consistent with amounts used by the Business historically.   Buyer will not transition additional call load from its customers existing prior to the date hereof or any new customers that are not obtained by the Buyer through the business purchased under the APA or through the Services.

The Term of Communication Services shall be the lesser of six (6) months or until Buyer implements its own IVR and ACD solution.

4.    **Additional Fees and Expenses:**

The following shall be considered Additional Fees and paid by the Buyer pursuant to Section III.B of the TSA:

A.    Buyer shall pay Base Monthly Fee of $25,000.00, payable in accordance with Article III of the TSA.  For any consulting style services which are expressly set forth as Additional Fees hereunder, Buyer shall pay on a time and materials basis at a rate of $100.00 per TSV employee hour.

B.    All reasonable out-of-pocket expenses of TSV related to providing the Services, each of which shall be approved in writing in advance by the Buyer.

C.    For purposes of clarity, unless otherwise provided herein or in writing signed by the Parties, Buyer will not be responsible for TSV's internal IT and resource costs to effectuate the Services.

5.    **TSV Assumptions:**

1.    TSV acknowledges that it's entering into this SOW and the TSA has been a material inducement to the Buyer's entering into the APA and consummating the transactions contemplated thereby.

2.    TSV will, in accordance with the TSA and this SOW, maintain and support the TSV systems and applications which contain data, information and functionality necessary for the Buyer to (i) transition such systems modifications, maintenance and support, (ii) operate its business, and (iii) transition away from its use of the Services.

3.    TSV will provide the Services to the Buyer at a priority level commensurate to or greater than that which TSV provides the same with respect to its own systems and shall allocate employees of the highest caliber of knowledge and skill sets with respect to the provision of such Services including employees of TSV who have supported WebImage in such Services in the past.

6.    **Identification of Representatives.**

A.    The initial TSV representative for the provision of Services and Assistance described in this Schedule is Felix Rodriguez

B.    The initial Buyer representative for receiving the Services and Assistance described in this Schedule is Shawn Hashmi

C.    The Parties' representatives will have primary responsibility for managing the relationship between the Parties with respect to the Services described in this Schedule, including attempts to resolve disagreements between the Parties.

D.    The Parties' representatives will meet from time to time, but no less than monthly unless otherwise agreed. During these meetings, the TSV representative shall report on the status of Services being provided under this Schedule and respond to concerns raised by the Buyer. Additionally, during these meetings, the Buyer representative shall report on the status of the Buyer's efforts to develop its IT Capabilities and/or secure services from Third Parties to provide the Services and Assistance to the Buyer for its own benefit and to reduce its dependency on XO

E.    Each Party's representative may be changed at any time upon written notice to the other Party.

**IN WITNESS HEREOF**, each of the parties have caused this Statement of Work to be executed by an authorized representative as of the date shown above:

**TSV Group, Inc.**                                    **Buyer:**

By: _____                    By: _____

Name:  Felix Rodriguez                             Name:  Gabriel Murphy

Title:    CEO                                             Title:    CEO